UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JONTUS WALKER,

                         Plaintiff,

     v.

CSL PLASMA, INC. and JOHN THIXTON         6:22-CV-6413-CJS-CDH
in his professional and individual
capacity,                                DECISION and ORDER
                         Defendants.

_____

## INTRODUCTION

Jontus Walker ("Plaintiff"), a self-described "African-American male," commenced this action against his former employer, CSL Plasma, Inc. ("CSL Plasma") and his "white male" former supervisor, John Thixton ("Thixton"), alleging employment discrimination on the basis of race, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), under theories of disparate treatment discrimination, hostile work environment, and retaliation.

Plaintiff was employed by CSL Plasma for less than year, beginning on January 27, 2020, and ending on December 11, 2020, when he was fired for misappropriation of funds. Plaintiff denies that he misappropriated funds, but admits that CSL Plasma believed he had when it fired him, primarily since his personal login credentials had been used to make the improper payments.[1]

_____

[1] *See*, Pl. Dep. at 77 ("Why do you believe CSL terminated your employment? A. Because they believed that I – I committed the improper payments. Q. And why did they believe that you committed the improper payments that were flagged at the center? A. Because my—my log-in ID was associated with it.").

Plaintiff nevertheless maintains that his race was a motivating factor in the firing, purportedly since CSL conducted an inadequate and biased investigation concerning the misappropriated funds, and subjected him to a racially-hostile work environment, prior to the firing.  Plaintiff also maintains the firing was retaliatory, purportedly since it occurred along with other retaliatory treatment he experienced after he complained to a supervisor about racist behavior by Thixton.

Now before the Court is Defendants' Motion for Summary Judgment. (ECF No. 49).  For the reasons discussed below, Defendants' motion is granted.

BACKGROUND

Unless otherwise noted, these are the undisputed facts of the case viewed in the light most-favorable to Plaintiff, as the non-moving party.  Defendant CSL Plasma, Inc. ("CSL") operates plasma collection centers across the United States, where plasma is collected from human donors for use in medical therapies.   The instant lawsuit involves CSL's plasma collection center in Greece, New York ("the Greece Center").

On January 27, 2020, CSL hired Plaintiff as Center Manager for the Greece Center.  At all relevant times, Plaintiff's immediate supervisor was defendant Thixton, one of CSL's Associate Directors of Operations and Quality ("ADOQ").   In Thixton's role as ADOQ, he was responsible for overseeing multiple plasma collection centers, including the Greece Center.  Thixton's immediate supervisor was CSL Regional Director Rhonda Harp ("Harp").

The Greece Center was divided into two employee teams, referred to by staff as "sides" or "teams," consisting of Quality Team ("Quality") and Operations Team

2

("Operations" or "Ops").[2]  The Quality Team reported directly to Thixton, while the Operations Team reported to Plaintiff, who reported to Thixton.[3]

Upon being hired, Plaintiff received a CSL employee handbook and a checklist of duties. Pl. Dep. at 44-45.  Plaintiff's duties as the Center Manager included (1) ensuring compliance with all CSL Standard Operating Procedures ("SOPs"); (2) maintaining a clean, efficient work environment,[4] such that the Center was "inspection ready at all times"; (3) adhering to Human Resources ("HR") policies; (4) adequately counseling employees; (5) handling day-to-day oversight and personnel issues; and, (6) working with HR to resolve or address any employee concerns or complaints that were raised with him regarding the work environment or other personnel.

Regarding CSL's human resources policies, Plaintiff was instructed that CSL had policies prohibiting discrimination, harassment, and retaliation,[5] and Plaintiff understood that he had a duty to report any employee complaints of harassment or discrimination to CSL's HR staff.[6]  At all relevant times, Dawn Allen ("Allen"), Employee Relations

_____

[2] Pl. Dep. at 26, 38.

[3] *See, e.g.*, Pl. Dep. 283 (Reference to Thixton indicating that Quality reported to him); *see also, id.* at 295 (Plaintiff admits that the Quality Team reported directly to Thixton.)

[4] Plaintiff's responsibility for ensuring that the Greece Center was clean and "inspection ready" required that he ensure: (1) the Center's floors were mopped clean, dry, and safe for donors and staff; (2) needle caps and debris were appropriately disposed of in the dumpster at the back of the Center; (3) the trash receptacle outside of the Center was appropriately maintained; and (4) the bathroom at the Center was clean and sanitary.  Thixton instructed all members of the Greece Center's management and staff, including Plaintiff, to ensure that these tasks were performed.  Plaintiff admits that in his capacity as Center Manager, he was ultimately responsible for ensuring that the aforementioned cleaning tasks were performed.  However, he denies that he was expected or required to personally perform such tasks. (citing Thixton Dep at 54, 56, 57).]

[5] Pl. Dep. at 50-52.

[6] *See*, Pl. Deposition at 53 ("Q. And did you understand that CSL management had a responsibility to report any employee complaints or concerns of discrimination, harassment or retaliation that they became aware of to human resources?  A. I did.").

Manager, was the HR manager responsible for the Greece Center, and the person to whom any discrimination complaints should have been directed.  Plaintiff also understood that CSL maintained anonymous hotlines for reporting discrimination, harassment and retaliation. Pl. Dep. at 53.

Plaintiff maintains that Thixton created a racially-hostile working environment for him and other black employees during the ten-month period of his employment that Thixton was the ADOQ for the Greece Center.  During that span, Plaintiff states that Thixton visited the Greece Center approximately just four, or possibly five, times, with some of those visits lasting multiple days. *See*, Pl. Dep. at 74 ("I think he might have come to my center maybe four times in my --in my tenure.  Maybe five.").  Plaintiff and Thixton communicated more regularly by telephone.

Plaintiff contends that the most pronounced example of Thixton's alleged racial animus was that on approximately three occasions,[7] he directed Plaintiff and/or other minority male employees to perform menial cleaning tasks.  Specifically, Plaintiff states that on one of Thixton's visits, he interrupted Plaintiff while he was meeting with two white employees and directed Plaintiff to mop a floor at the Greece Center.[8]  Plaintiff alleges that on another occasion, Thixton directed him to clean the Greece Center's parking lot.[9]  And, on another occasion, Plaintiff maintains that Thixton ordered him and

_____

[7] In his deposition, Plaintiff vaguely asserted essentially that Thixton did something inappropriate every time he came to the Greece Center, but upon further questioning these are the particular incidents he identified.

[8] Pl. Dep. at p. 59-60, 70.  Plaintiff believes that Thixton did this to "put him down" "in front of his white staff." Pl. Dep. 71.

[9] Pl. Dep. at 72-75, 110.

four other employees, three of whom were black and one of whom was Hispanic, along with the Center's janitor, to clean a bathroom.[10]  Plaintiff maintains he never saw Thixton tell any white employee, male or female, to perform similar cleaning tasks.[11]

The record offers no context for the performance of these cleaning tasks, except that Plaintiff indicates the bathroom cleaning incident involved, at least in part, a particular floor stain, which the employees eventually concluded they could not remove, requiring the Greece Center to hire an outside contractor.[12]  As discussed further below, the Greece Center failed an inspection by CSL, which Thixton maintains was due in part to Plaintiff failing to have the Center sufficiently clean.[13]  Thixton also maintains that the floors at the Greece Center were frequently wet, contrary to his instructions to all Greece Center management to keep the floors "dry and safe," Thixton Decl. at ¶ 6, though Plaintiff again disagrees.  In any event, Thixton agrees that it would have been inappropriate for him to order Plaintiff to personally perform such cleaning tasks, and denies that he ever did so.[14]

Plaintiff further contends that Thixton displayed "open contempt" toward black employees by his verbal and non-verbal interactions with staff, primarily by committing "microaggressions" involving his "tone" and "word choice." *See*, Pl. Dep. at p. 76 ("[A]

_____

[10] Pl. Dep. 113, 118-120.

[11] Pl. Dep. 109.

[12] Pl. Dep. at 120.

[13] Plaintiff disputes the assertion that the Greece Center was ever insufficiently clean, but does not specifically dispute that lack of cleanliness was one of the reasons given by the auditor for assigning a failing grade to the Greece Center.

[14] *See*, Thixton Dep. at 56 ("Q. Is it appropriate for management, upper management to instruct the center manager that he, in particular, must go clean the bathroom?  A.  That never happened, no.").

microaggression.  It's hard to prove, you know, like, you know, tone and word choice when it's just you and the other person.").

On this point, Plaintiff maintains that Thixton was rude to all employees at the Greece Center, regardless of race, but that "black people got the worst of the treatment":

> Q. [I]s there anything else that [Thixton] did wrong?
>
> A. Well, yes.  I mean like – and this is not just on the basis of racism.  Just— just the overall way he treated the staff.  And that's not just the black people. I think the black people got the worst of the treatment but, like, he treated everybody terribly.   The white people would say that, too.   He had his favorites which was for sure Katie [Soles],but he was –he treated everybody bad.  'Cause just, in general, he's not the nicest of people.

Pl. Dep. 76.  Plaintiff further stated:

> [I]t's just the way that he's, you know, openly talking to people. You know, so like the open contempt was often, you know, just conversation. You know, just, you know, the way he would customarily dismiss people. The way he would, you know, kind of leave people feeling -- and it wasn't -- that part, just to black people but they certainly did get the brunt of it. But he did that to quite a few people that were -- he's done that to Tyrhondia who is a black -- one of the front desk people. He's done it to her. He's done it to... I've seen him do it to Ariel. I've seen him do it to some of the other -- some of the nurses, some of the phlebotomists. And they were -- some of them were white.  You know, so part of that I think, you know, is his personality trait but, like, there were -- there were extra instances where, you know, it was not just him being, you know, rude and contemptuous.  You know, he was also being racist to, you know, some of the black staff.  . . .  Just how he talked to [them].  You know, can ask somebody to do something and not be rude.  You can ask somebody to do something and not be racist.

Pl. Dep. 127-128.

When asked to elaborate on how Thixton asked black employees in a "racist" manner to do things, Plaintiff stated that Thixton would be "extra rude":

6

> So I would -- I would kind of say that that was the microaggressive piece, you know, which is... like the -- initially, I would not have called it racist. But it was the combination of what I was seeing happen to myself and to other people that I started to make the summation that, you know, this is – this is racist. It was -- you know, 'cause he -- even though is he kind of just generally a rude person, he was -- he was extra rude, you now, with very specific people and those people were black.

Pl. Dep. 129.  When asked to be even more specific, Plaintiff stated that it was Thixton's "tone" that was offensive. *See*, Pl. Dep. 130 ("It would be his tone."); *see also, id.* at 61 ("The condescending tone.").

Regarding Thixton's alleged "microaggresive" "word choices," Plaintiff cannot recall anything specific that Thixton said. *See*, Pl. Dep. at 61 ("I don't remember exactly how things were worded, but there were—there were things that he would say that would kind of just have racist undertones to them.  I can't think of, like, anything specific.").  There is no indication in the record that Thixton ever used epithets or referred to any employee's race.

Plaintiff also contends that on at least one occasion, Thixton opened his closed office door and walked away. *See*, Pl. Dep. at 61 ("You now, like, I might have my door closed.  He'd come and just open it and walk away.").  The record provides no further context for this incident.

Plaintiff further alleges that Thixton would "routinely ignore [his] telephone calls when [he] asked for help." ECF No. 55-9, Pl. Decl. at ¶ 26.  As an example of this, Plaintiff states that Thixton once delayed returning a phone call "for about an hour": "Once, when a donor passed out I didn't know what the proper report to file was and called him for guidance.  He didn't call back for about an hour and I had to track down help from other sources." *Id*. at ¶ 27.

7

Plaintiff also believes that Thixton showed favoritism to the Greece Center's Center Supervisor, Katie Soles ("Soles"), which undermined Plaintiff's authority. *See*, Pl. Dep. at p. 76 ("He had his favorites, which was for sure Katie[.]").  In particular, Plaintiff became upset after Thixton gave coats with the CSL logo on them to three female Greece Center employees, one of whom was black, and two of whom worked for Thixton's Quality Team.[15]  Plaintiff was particularly annoyed by the fact that Thixton gave a coat to Soles, but not to other members of the Operations team, which Plaintiff interpreted as an attempt by Thixton to "sabotage"[16] his authority:

> [H]e [(Thixton)] had given coats to, you know, other employees and what -- what I believed, that the impact of that was 'cause I felt like he was -- he gave coats to, you know, people who -- especially on the Ops side. You know, 'cause I -- I didn't manage the Quality side even though they were in my center. They didn't report to me. So like they kind of had their own -- their own walk-up in the organization. [sic]  But on the Ops side, you know, if you're going to buy one person in Ops a coat, you know, for something -- for anything that's done, you know, the people that manage them would have likely have gotten a coat, too, because they were the ones managing, you know, that -- that work.  And, like, we didn't even know the coats were coming.  So it was very specific to cut out other people.
>
> ***
>
> I felt like, you know, him buying the coat was offensive and I felt like it was improper. And I even asked him about it. So, you know, I think he -- I think he talked his way out of it. He said that, you know, like, he did it because she [(Soles)] did such a good job.  And I was like, Well, how is she doing such a good job? She's doing what she's been instructed to do. That would mean that the assistant managers that were presiding over her were doing a good job, too. That also means that me as the center manager who works -- who provides over them would also be doing a good job.  You can't just specifically, you know, identify, you know, one person doing a good job and then not, you know, recognize the other people.  . . .  [W]hat he did was kind

_____

[15] *See*, Thixton Dep. at 64 (Thixton testified that he gave coats to Soles, Susan Shea, and Ariel Forest, who "is African-American.").

[16] Pl. Dep. at 100.

8

of... what's the word? It was -- it kind of was like an infection. . . . [H]e kind of started this whole problem with – with recognition because people now felt like, you know, well, he's very specifically only recognizing, you know, one person in ops and, like, all these other people who were doing all this hard work, you know, are not getting recognized and why does she get it and not anybody else. And, you know, it just kind of created a whole series of problems from there. . . .   On the Ops side, Katie was the only person that got a coat.

Pl. Dep. 100-106.  Plaintiff contends that Thixton "dismissed his concern" about this matter, which he interpreted as further evidence of Thixton's "open contempt" for him. *See*, Pl. Dep. 107, 108 ("[H]e was basically saying I'm going to do what I want.  I wanted to recognize her, so deal with it.").

Plaintiff contends that Thixton also showed racial "open contempt" by refusing to personally assist him in preparing for an inspection at the Greece Center.  In this regard, as a medical facility, at all relevant times the Greece Center was subject to audits by regulatory bodies including the German Health Alliance, Federal Drug Administration, and state agencies.[17]  To prepare its centers for such audits, CSL would conduct its own internal audits of its centers.  In preparation for such an internal audit at the Greece Center, Thixton visited the Greece Center twice, on April 25, 2020, and May 20, 2020, to review CSL's standard operating procedures and compliance checklists with Plaintiff and the center staff.  Thixton also assigned a tenured Center Manager from McKeesport, Pennsylvania, to report to the Greece Center during April and May of 2020, to help train Plaintiff and prepare him for the next internal audit at the Greece Center.

_____

[17] Thixton Decl. at ¶ 8.

9

The internal audit was conducted on August 5-6, 2020, and the Greece Center failed,[18] though Plaintiff maintains it came very close to passing.   However, Plaintiff contends that the Greece Center might have passed the audit if Thixton had made himself more available to Plaintiff, rather than sending other people to help him prepare. *See*, Pl. Dep. at 308-309 ("John was, you know, like a 24- 25-year veteran in the company and we had, like, a major audit and I was asking for help, you know.  And like, typically, the ADOQs would come and kind of do a mock audit with you.  He never came.  . . .  [W]hat he did do is he did send people -- he did send people but, you know, these are other people, you know, that he just chose to send. But his -- he would not avail himself to me, which is kind what the center manager/ADOQ relationship is supposed to be.").  When asked why he believed that Thixton's alleged lack of assistance with the audit was racially motivated, Plaintiff answered, in pertinent part: "Just the, you know –his word choice toward me,[19] you know, lack of getting back.  . . . [H]e was very nonresponsive to me." Pl. Dep. at 309.

Because the Greece Center failed the audit, Plaintiff maintains that Thixton imposed on him "a whole series of additional check-ins and extra work," which he believes was also due to racial animus. *See*, Pl. Dep. at 308 ("So ultimately we failed the audit.  And then, like that produced a whole series of, you know, additional check ins

_____

[18] According to Thixton, the Greece Center failed the audit "because of poor management on Plaintiff's part, including failure to ensure that the Center was clean and tidy and that the Center complied with safety and quality protocols for collecting plasma samples." ECF No. 49-5, Thixton Decl. at ¶ 9. Plaintiff responds that "[t]he Greece Center was more than adequately clean during the audit," but this appears to be a statement of opinion which does not expressly dispute that the reasons cited by Thixton were the reasons given by the auditor.  In any event, the reasons the Center failed the audit are not relevant to the Court's decision.

[19] As noted earlier, Plaintiff cannot recall any particular alleged "microaggressive word choice" by Thixton. Pl. Dep. at 61.

and extra work.  And that was very much driven by, you know, just the way he perceived me racially.  'Cause we had already, you know, bumped heads several times.").

Plaintiff intentionally did not report any of Thixton's alleged racial open contempt toward him or toward other black employees to anyone at CSL, and, in that regard, failed to use any of the established means that were available to him as discussed previously, such as a direct complaint to HR or the use of an anonymous tip line. Plaintiff maintains this was initially because he wasn't sure if Thixton's actions were discriminatory, and later because he did not want to suffer any personal repercussions, since he suspected that HR employees would be sympathetic to Thixton.

For example, when asked why he never reported Thixton's alleged actions in ordering black staff to perform "demoralizing tasks," Plaintiff testified:

Q. And did you report the concern about black male staff being disrupted and instructed to perform ministerial or demoralizing [cleaning] tasks to human resources?

A. I didn't.

Q. Okay.  And why not?

A. Because I felt like it could be -- it could easily be explained away.  I felt like if I was going to report it, I would have to report something that was much more concrete. And I -- and then as -- as a black person myself, I also wanted to be careful with throwing that around. 'Cause I don't -- I don't – I don't take it lightly that -- if you're -- if you're going to say something about someone being racist -- I mean, someone may be just a terrible person and not be a racist. So I was kind of trying to figure out is he doing this because he's a jerk or is he doing this because he's racist. So I wasn't quite sure, you know, right away, you know, how to move with that.  And then my HR contact he was very close with. Because he had been with the company for very long -- a very long time. And, actually, my HR contacts -- the two HR contracts that I know, my HR business partner

11

and then her manager, he was very close with. So I knew that if I was going to say something about it, I would have to be -- I would have to have some pretty strong evidence and I didn't feel like that was strong evidence. As kind of -- as individual things.

Q. So you're referencing that Mr. Thixton was close with some of your HR contacts. But as we reviewed earlier in this deposition when we reviewed the handbook, there were hotline platforms  that you could anonymously make a report to; correct?

A. Yes.

Pl. Dep. at 121-122; *see also, id*. at 311 ("I wasn't sure I believed that it was anonymous, which is why I wasn't—I wasn't keen on taking up that option."); *see also, id*. at 321 ("I wasn't sure that I wanted to brand it as racist.  I knew there were some issues there, but wasn't sure if race was the motivation at the time.").

Regarding his belief that Thixton had close personal ties with the HR staff, Plaintiff testified:

[M]y HR person was a close friend of his.  He told me that.  And so did she.  They had both been with the company for quite awhile.  And, you know, one day—I said something on a call.  I don't remember exactly what it was that I said.  But he—he kind of gave me the impression that, like, she though less of me because of what I said.  And, you know, like that— that whole talk track kind of made me feel like I didn't really have, like, even an HR point because, like, he just—you know, he knew all these people.  You know, he had spent year, you know, getting to know these people people and all of that.  So I felt very much that I didn't have HR support[.]

Pl. Dep. at 309-310.[20]

_____

[20] Because of his belief on this point, Plaintiff contends that CSL failed to provide him with a nonbiased avenue of making a complaint. *See*, Pl. Dep. at 279-280 ("I feel like CSL kind of provided the systemic structure that did not—that I felt like I could go to to kind of express what was really happening to me and my – and the people that reported to me.").

Plaintiff similarly contends that, despite his obligation to report harassment and discrimination to CSL, as discussed earlier, he never made any report to HR about Thixton's alleged verbal "open contempt" toward other black employees, even though he claims that other black employees complained to him about Thixton. Pl. Dep. 133. On this point, Plaintiff testified:

> So I didn't specifically report it myself because I didn't quite know what the repercussions of my reporting it would be, being that John had already, you know, in my opinion been fairly aggressive in his behaviors towards me and the other people on my team.  And so I was trying to thoughtfully navigate through that so that I could, one, be a protection for them and, two, you know, be able to rightfully navigate myself through these waters.

Pl. Dep. 134.  Plaintiff claims, in particular, that when black employees complained to him about interactions with Thixton they subjectively believed were racially charged, he reported the bare job-related aspect of the complaint to HR, but intentionally omitted any reference to suspicions of racial bias.[21]

Plaintiff claims that at other times, he declined to get involved and suggested that the employees report the complaint to HR themselves. *See*, Pl. Dep. at 315-316 (Q. And did you report her concerns to human resources? A. No.  Q. And why not?  A.  For the same reasons I've mentioned before.  You know, I know John[,] and John was friends with some of those HR partners.  And I encouraged everyone that came to me to

_____

[21] *See, e.g.*, Pl. Dep. at 320 ("Q. So I know that you said you looped in HR with respect to LePorschea's issues with this other employee spreading rumors about her sleeping with someone.  But did you contact HR with respect to any claims that she had of racism?  A. No. She brought that up with HR.  Q. Okay.  And you didn't loop in HR [for] all the same reasons that you've stated previously?  A. Right.  Because I wasn't sure how I was going to be able to navigate that space and I wasn't—because I hadn't experienced that with him right away, I wasn't sure that I wanted to brand it as racist."); *see also, id.* at 329 ("A. I did raise the scheduling piece to HR, I believe, but not for the sake of racism.  Just like the logistics of it. Q. Uh huh.  And you didn't raise the racism concerns with HR for the same reasons we've already covered?  A. Correct.").

report—report it to HR themselves."); *see also, id.* at 316-317 ("And the concerns she raised with you when you were employed by CSL, did you escalate those to HR?  A. No.  For the same reasons I didn't before.  But I encouraged her to, you know, seek her—seek her resolutions, you know, with HR on her own.").  However, the record indicates that no CSL employee ever filed a discrimination complaint against Thixton, until Plaintiff did so after he was fired.[22]

Plaintiff similarly maintains that he never complained to HR about Thixton's alleged efforts to obstruct and sabotage him, such as by buying a coat for Soles, since he didn't see how it would benefit him. *See*, Pl. Dep. at 146 ("Q. [W]e discussed some of your examples of being obstructed and sabotaged.  Did you report any of those concerns to human resources?  A.  No.  Q.  Okay.  And why not?  A. I didn't – I didn't know how—I didn't know how that would work out for my benefit.").

Plaintiff maintains he believed that HR officials had a similarly close relationship with Thixton's supervisor, Harp, whom he also believes harbored racial animus, purportedly since she committed "microaggressions" toward him during a conversation, by "rolling her eyes" and being "dismissive." *See*, Pl. Dep. at 63 ("I didn't know of a nonbiased place that I could go to make the complaint, which is why I ultimately landed here.  Because I didn't see a person that—within CSL that was not connected to John or Rhonda in the way of being able to be nonbiased towards them."); *see also, id.* at 65 ("Q. And can you provide specific examples of the microaggressions you observed

_____

[22] For example, Thixton's unrefuted sworn testimony is that apart from this lawsuit, no CSL employee ever lodged a complaint of racial discrimination against him.

during that conversation with Rhonda?  A. The rolling of eyes.  You know, just kind of the –the word choice[23] and dismissal of my perspective.").

Nevertheless, although Plaintiff never complained to HR about Thixton, he maintains he made certain complaints about Thixton to Harp during a conversation that she initiated with him.  Regarding this conversation, Harp maintains that on one of the few occasions that she was present at the Greece Center, the Center's janitor, Arthur Kerr ("Kerr") told her that he had observed Thixton speaking rudely to Plaintiff, but that when she asked Plaintiff about it, he denied that Thixton had done anything improper:

> Q. Do you recall meeting with Jontus Walker in response to concerns that had been raised by the janitor at the Greece center, a gentleman named Arthur Kerr?
>
>                        ***
>
> A. Yes.
>
> Q. And what do you recall about that conversation with Jontus?
>
> A. I pulled him to the side, and I think – I actually think we went into his office, so it would be a private setting. I explained to him that Arthur had come to me with a concern that he felt as if, from his perspective, that John Thixton was rude and condescending, and then he had shared an interaction that he, Arthur, had observed with Jontus and John. And when I mentioned this to Jontus, I asked him -- I said, was he disrespectful? Did you feel uncomfortable? He, kind of, actually, kind of -- from what I remember, he, kind of, went, I can't believe he said something to you. There was nothing to it. I mean, that's, kind of, the comment he made. And I said, well, I just want to make sure. He said, no. He said, we both, kind of -- our voices got elevated, but we worked it out.  [He said,] John's never been disrespectful. He is just direct.
>
> Q. He is just direct, did you say?

_____

[23] As with Thixton, Plaintiff does not identify any particular alleged "microaggressive word choice" by Harp.

A. Direct. Uh-huh.

Q. And did you -- do you recall discussing with Jontus any concerns articulated by Arthur per -- that Mr. Thixton had a racial bias against Jontus based on his race?

A. No.

Q. Do you recall during that conversation that you just described for us any discussion with Jontus concerning a racial bias by Mr. Thixton against black people?

A. No.

Q. Do you recall any discussion of race during the conversation that you had with Jontus that you just described for us regarding the concerns articulated by Arthur Kerr?

A. No.

Q. What, if anything, did you tell Jontus at the conclusion of your conversation prompted by the concerns by Arthur Kerr?

A. I just explained to him that Arthur had shared with me he had a concern in regard to what he had observed with Jontus and John in regard to a conversation. And when I mentioned it to Jontus, he -- like I said, he said, I can't believe he [(Kerr)] said it. It was nothing. I said, was he disrespectful or did you feel uncomfortable? He said, no, he was not disrespectful. We both elevated our voice and we worked through it. There was nothing to it.

Q. Did you tell Jontus that you would look into anything regarding the incident that had been brought to your attention by Arthur Kerr?

A. No, because at that point Jontus said there was nothing to it.

Harp Deposition at 138-141 (counsel's objections to form omitted).

Plaintiff, however, disputes Harp's recollection of this conversation, insofar as she maintains he did not complain about Thixton. *See*, Pl. Dep. at 64 ("Q. So did you

complain to Rhonda about John?  A.  I didn't initiate a complaint.  She actually came to me about someone else's complaint.  And in that conversation I did.").  In particular, Plaintiff describes his statements to Harp as having involved Thixton's "open contempt," which, as discussed earlier, is the term Plaintiff uses to describe Thixton's alleged rude, condescending and dismissive demeanor:

> Q. Okay.  And did you report any of your concerns about open contempt and disrespect to human resources?  .
>
> ***
>
> A. I didn't report it to human resources.  I reported it to Rhonda when— Arthur must have reported something—I don't know how Arthur reported. I don't know if he reported to human resources or a – you know, like a hotline or what.  But Arthur eventually did come around and tell me he did report it.  He didn't tell me how he reported it.  But Rhonda asked me about when she came.  And I told her, you know, about, you know, John's open contempt[.]

Pl. Dep. at 132-133.

Regarding the specifics of that conversation with Harp, Plaintiff testified in pertinent part as follows:

> Q. And what specifically did [Harp] convey to you about what Mr. Kerr had complained about?
>
> A. His initial complaint was about him hearing a conversation that John and I had about how -- his complaint was about how John was talking to me.  And I believe he also complained about his own interactions with John. I never saw the complaint or anything like that, so I don't know the exactness of it.
>
> Q. Okay. But in that conversation you had with Rhonda, what specifically did she say was the purpose of the meeting or what did she want to talk to you about?
>
> A. About -- about the complaint that Arthur had and that -- *that it indicated that other people had experienced racism from John*.

17

Q. Did she specifically state that Arthur raised concerns of racism or did she state that it was concerns about him being rude and unruly?

A. *I don't know exactly remember how she framed it, but we ended up talking about racism.*

Q. And in what context did you end up talking about racism?

A. Just kind of -- some of the very things that I expressed to you a little bit earlier I mentioned to her. *Like microaggressions. I never used the word racism either. I just kind of spoke to the behaviors and the experiences that I had experienced.* And what people had told me.

Q. About John; correct?

A. Correct.

Q. Okay. And what was her response to the information that you provided to her?

A. She didn't really give a response. She kind of just wrote things down and asked, you know, kind of subsequent questions like, you know -- kind of like what you're doing. Like, do you know when? You know, was there anybody else there? You know, that kind of thing.

Q. Okay. Did you provide her with specific examples of microaggressions or just kind of convey, in general, how you felt working with John?

A. I did -- I gave pretty much the same examples that I gave you. All of them hadn't happened by then. Some of them had, though. So I gave her a series of examples.

Q. And can you recount what those examples were? I just want to make sure --

A. I know the -- *I know specifically I gave her the example of, like, being pulled out of the meeting to do the floor. That was -- that was specific. But I don't remember some of the other things that I had said.*

Q. Okay. So --

18

A. And the door -- and the door being opened. Like, you'd walk through an open door.

Q. Okay. So you sure that you told her that Mr. Thixton had pulled you out of meetings and instructed you to perform janitorial duties and you're sure that you told her that sometimes you would have your office door closed and he would come by and open it. But other than that, you can't recall other examples you gave her; correct?

A. Yeah. And I didn't --  And I didn't say janitorial duties to her. *I just specifically said he asked me to mop the floor*.

***

Q. *You never used the word racist in your conversation with Ms. Harp, correct?*

A. *That is correct.*

Pl. Dep. at 148-153 (emphasis added; attorney objections omitted); *see also, id*. at 326 (Plaintiff testified that Kerr's complaint to Harp involved Kerr being "upset about just John's tone . . .  [H]e had a lot of issues with John's delivery."); *id*. at 324-325 ("[Arthur] felt like John was—spoke to him, you know, in a way that was condescending.  You know, from a place of superiority."); *id*. at 326 ("[Arthur] was upset about just John's tone with me, his word choice[.]").

During this same conversation,[24] Plaintiff complained to Harp about Thixton having given a coat to Soles but not to other members of the Operations team, as discussed earlier.  In particular, Plaintiff claims he told Harp that it was "offensive" and

_____
    [24] The record indicates that Plaintiff had only one conversation with Harp concerning Thixton. *See*, Pl. Dep. at 64-65 ("I did have some microaggressions in a conversation with [Harp] and kind of being dismissed in how—in how I was complaining about John. . . . Q. And was it one conversation?  A. Yeah. I had only had, like a one-complaint conversation with her.").

19

"improper" for Thixton to give coats, as a form of recognition, to some employees but not others:

> Q. Okay. And in terms of this concern about the employees receiving coats, did you report this concern to HR?
>
> A. I didn't report it to HR, but I told Rhonda when she came.
>
>                   ***
>
> Q. And what specifically did you tell her with respect to your concern about the coats?
>
> A. I brought up that he had -- he had given coats to, you know, other employees and what -- what I believed, that the impact of that [was.]
>
>                   ***
>
> Q. What specifically did you say to Rhonda when you raised this concern?
>
> A. That I felt like, you know, him buying the coat was offensive and I felt like it was improper.   . . .   You can't just specifically, you know, identify, you know, one person doing a good job and then not, you know, recognize the other people. So that was my complaint to Rhonda that, you know, what he did was kind of... what's the  word? It was -- it kind of was like an infection. You know, he kind of like started a... I can't think of the word that I want to use. But he kind of started this whole problem with – with recognition because people now felt like, you know, well, he's very specifically only recognizing, you know, one person in Ops and, like, all these other people who were doing all this hard work, you know, are not getting recognized and why does she get it and not anybody else. And, you know, it just kind of created a whole series of problems from there. And I complained about that.

Pl. Dep. at 103-106.

Harp indicates that following her discussions with Plaintiff and Kerr, she told Thixton only that a CSL employee, whom she did not identify by name or center location, had complained about him being rude and too direct:

> Q. Did you communicate with Mr. Thixton regarding the concerns that had been brought to your attention by Mr. Kerr?

A. What I discussed with John was it has—someone brought a concern to me that you're direct and sometimes can be viewed as being rude and that you need to, you know, assess your communication with individuals.

Q. And did you identify Mr. Kerr?

A. No, not that I recall.

Q. Did you identify Jontus?

A. No.

Q. Did you—what, if anything, did you tell Mr. Thixton in that communication about the incident that Arthur Kerr described to you?

A. The only information that I mentioned to John was that he was coming across as potentially being rude and condescending.  To me, that's a behavior that he needed to work on.

Q. Did you mention the Greece Center in connection with what you articulated to Mr. Thixton?

A. Not that I'm aware of.

Q. Did you mention a time frame?

A. No.

Harp Dep. at 141-143.

Thixton maintains that Harp spoke to him about the matter, and that she told him only that Arthur Kerr had complained about him being too direct. *See*, Thixton Dep. at 53-54 ("[I]t wasn't about race.  It was more about that I was—what's the word I want to say—too direct with Mr.—with Arthur.").

21

Plaintiff, though, contends that Harp must have informed Thixton about his comments, since immediately after his conversation with Harp, Thixton began to treat him differently, primarily by trying to "manage the center through Katie Soles."

As background to this contention, Plaintiff complains that throughout his employment at the Greece Center, Soles and another employee, Susan Shea ("Shea"), who was a member of the Quality Team that reported to Thixton, included Thixton in communications that Plaintiff believes should have been directed only to himself.[25] Plaintiff contends that Soles and Shea did not follow established lines of communication in this regard,[26] which, since he is black, is evidence of "systemic racism" that existed at the Greece Center, which Thixton "used" to "circumvent" him:

> Q. [D]o you have specific examples of non-black male leadership engaging in efforts to obstruct and sabotage the success of any of the non-white male staff during your employment with CSL[, as you allege in your pleading?]
>
> A. Well yes.  I would say that that would be Katie and even Susan Shea at some point.  And I wouldn't say that Susan was racist.  I actually probably wouldn't say that Katie was either.  But, like, they participated in kind of the systemicness [sic] of how that racism could happen with just being able to, you know, have direct line to John and bypass levels of business that, like, we didn't establish.  CSL established those.  And so there's a certain level of responsibility that you have to go to our direct manager and, like, she circumvented that all the time.  So did Susan.  And John was using both of them to circumvent, you know, those other established levels.

_____

[25] It is unclear to the Court why Plaintiff believes that Shea was required to communicate only with him, since the record indicates the Quality Team members reported to Thixton.

[26] See, Pl. Dep. at 124 ("Katie was emailing him.  You know, like, copying him on emails.  And I specifically spoke to that.  You know, just – because I'm responsible for the center and if you have issues, you need to bring them to me.  You know, like you can't just copy him in on everything in the center because you don't report to him."); *see also, id*. ("[I]t was a point of contention my – my whole time that she worked there.").

Pl. Dep. at 134-135; *see also, id*. ("I don't know that [Thixton] actually started that.  I think Katie was the initiator on that and he just kind of went with it after he realized that that was a way that he could--  he could manage.").

Plaintiff contends that immediately after his conversation with Harp, Thixton went further, and  stopped communicating with him and began "managing the center through Katie Soles" by "basically driving all of his communications through Katie and not" through Plaintiff. [27]  At the same time, Plaintiff contends that following his conversation with Harp, Thixton still communicated with him, but his communication style changed:

> Q. So you claim [in your pleading that] within or about a week of the discussion you had [with Harp] regarding the janitor [(Kerr)] that you began experiencing a palpably different treatment by defendant Thixton including increased alienation and being ostracized from management level meetings.  So what is the basis for feeling that you were alienated during your employment with CSL?
>
> A. Because John began to manage through Katie [Soles]  and not me. He had already -- he didn't particularly care for Michael Massaro either, so he really wasn't working with him. Arooj had resigned already. So she was no longer there. So I was short an assistant manager. And he was basically driving all of his communications through Katie and not really with me. So it did progressively get worse. It wasn't just that he was driving communication through Katie, but he was, you know, very slow to respond to my correspondence with him.  And sometimes he didn't respond to it at all. And he was definitely more hostile towards me than he was prior to.
>
> Q. So what do you mean when you say he was more hostile towards you?
>
> A. So he -- you know, where he may, you know, like, initially where he would come in and he would just – he would -- he might ask me to do something, you know, his word track changed. He kind of was demanding

_____

[27] *See*, Pl. Dep. at 296-297 ("Q. So it wasn't until you had that conversation with Rhonda about Mr. Kerr's concerns that Mr. Thixton began to communicate with you through Ms. Soles?  A. Correct.").

it and he would... just when I would talk to him, he would be very dismissive of -- of my replies to him. You know, he wouldn't – he wouldn't necessarily let me finish, like, my statements. He'd kind of, like, cut me off all the time. He... I felt like he was -- I don't know -- just taking authority from me to, like, manage the business. You know, he didn't want me talking to the Quality team and, like, it doesn't really work that way. Ops and Quality work hand in hand. So, you know, he was saying, you know, they don't report to you so, like, don't ask them questions. And I was saying to him, I'm the center manager. You know, everybody in this center I should be able to ask anything, you know, at any given moment.  So we bumped heads on that. We bumped heads on the marketing. He just – he was very critical of everything that I, you know, was attempting to do. He wanted me to, like, check in with him excessively, you know, like, you know, report everything.  . . .  And, you know, it just was a lot of extra -- he just added – he just doubled down on his -- on the way he kind of like allowed me to, like, freely manage the site. I had to like -- I had to get his approval for, you know, kind of ridiculous things that just wouldn't -- wouldn't make sense. Like what things I was buying for the giveaways. I had to get his approval for that. And just stuff that I just wouldn't have had to do and didn't have to do prior to.

***

Q. And you noticed a change in his behavior shortly after that conversation with Ms. Harp?

A. It was almost immediate. It was, like, my very next conversation with him. My very next interaction with him was -- you know, it was cold. Very cold. And aggressive.

***

Q. Okay. And other than what we discussed, do you have any other examples of how you were alienated during your employment with CSL?

A. I mean, you know, he was telling me where I could have meetings, how I could have them. You know, who I could have them with, you know, and just -- it just became increasingly more difficult. You know, I would ask for, you know, help and prior to he was fairly accommodating in that regard and, you know, then it became this is a – you know, a you problem. Like, you need to manage your staff better. You know, so he was just -- he kind of pulled back on his resources for offering help, you know, so I knew based on that, you know, I wasn't... I was going to have a hard time being successful under him.

\*\*\*

Q. Okay. And then turning to your allegation that you were ostracized from management-level meetings after your conversation with Ms. Harp, can you provide some specific examples of being ostracized from meetings.

A. So meetings about how -- like what kind of equipment we were getting, like the repairing of the equipment, opportunities for, you know, the staff to go and do things. Like all of those things were kind of coming from Katie and they weren't coming to me. He was communicating kind of the direction of the center through Katie as opposed to doing it through me. And, ultimately, I would find out about it, so I was still able to be effective in managing, but I just had -- I had all these other, you know, forums that I had to, you know, kind of go through to do that. All these other obstacles, you know, that just would not have and didn't normally exist prior to.

\*\*\*

He wasn't really communicating with me through Katie. He was communicating with Katie and Katie was communicating with me. I don't think his intention was to communicate with me. I think his intention was to keep me out of it. And Katie knew that she had to communicate with me because I was her indirect manager.

Pl. Dep. at 280-289, 298; *see also*, Pl. Dep. at 124 ("[H]e was essentially trying to manage the center through Katie. That in and of itself was open contempt and disrespect because Katie was emailing him.").

Although, regarding Plaintiff's assertion that Thixton excluded him from discussions involving the maintenance of equipment, he also testified that "maintenance of machines" was something that Soles traditionally handled at the Center, and that he wasn't sure whether it was Thixton or Soles who initiated their communications concerning those matters:

Specifically in regard to, like, the maintenance of the machines, that was kind of something that she ran in the center. And he completely stopped talking to me about the maintenance of the machines and spoke directly to her. And I don't know whether that was initiated by her or by him.

Pl. Dep. at 295.

25

Plaintiff further maintains that after his conversation with Harp, Thixton "doubled down on the mistreatment" of "black staff" generally, Pl. Dep. at 277, though he provides no specific examples of this.

In late November 2020, CSL discovered that a number of unexplained payments had been made to plasma donors from Plaintiff's user account. In this regard, at all relevant times CSL paid donors for their plasma, and several of the CSL Greece Center staff were also paid plasma donors.[28] Plasma donors were issued reloadable debit cards, onto which payments for their donations were made automatically upon completion of a donation.[29] However, certain staff at the Greece Center were also able to make manual payments to donors, in "special circumstances," by logging onto CSL's NexLynk manual payment software.[30] Such special circumstances could include where a donor had experienced an inconvenience during the donation process; where a donor had received a postcard from CSL promising a higher-than-usual rate for a donation; or where a donor received a bonus for referring a new donor.[31]

Any member of CSL management who made a manual payment using NexLynk had to log onto the system using his or her unique log-in credentials. Such person would also have to provide an explanation for the payment. A software program called "Jasper" would produce a report of manual payments made each day, indicating the amount of each payment, the purported reason for the payment, the identification of the person to whom payment was made, and the identity of the person making the

_____

[28] The pay rate for donors varied by center, but at the Greece Center, non-employee donors were paid $50 for each donation, and employee donors paid $70. See, Thixton Dep. at 85, ECF No. 49-7 at p. 5; *see also, id*. at 41-42.

[29] Pl. Dep. at 34.

[30] Pl. Dep. at 35.

[31] Pl. Dep. at 36.

payment.  The purpose of the Jasper report was to ensure that manual payments were made for appropriate reasons.[32]  CSL's operating procedures required that Greece Center management review the Jasper report each day.  CSL's corporate Business Technology ("BT") staff also reviewed the daily Jasper report of manual payments to check for unusual payments.

A manual payment on the Jasper report could be flagged for investigation by CSL for a number of reasons, including that the reason given for the payment was vague or missing, or that the payment was made to an ineligible "deferred" donor.  In that regard, plasma donors could become ineligible to donate for various reasons, such as by having a medical condition that prohibited donation for a period of time,[33] by failing to provide a proper address to CSL, or by having received an improper manual payment.[34]  Donors who became ineligible to receive payment were designated as "deferred" on CSL's donor tracking system.[35]

On November 25, 2020, CSL BT Operations employee Scott Kitsmiller ("Kitsmiller") reviewed the Greece Center's Jasper report of manual payments from the previous day, and noticed that a series of twenty-two manual payments, totaling $250, had been made to one donor ("Donor 1"), using Plaintiff's personal login information.

_____

[32] Pl. Dep. at 40.

[33] *See, e.g.*, Katie Soles Dep. at 19-20, 29-31 (Discussing how a particular donor had become "deferred" for a 56-day period after a problem during the donation process resulted in "cell loss," a condition where red blood cells were not returned to the donor due to a blockage in the tube that returned blood to the donor following extraction of plasma.)

[34] *See*, Thixton Dep. at 101, ECF No. 55-3 ("Q.  Now, you mentioned a moment ago about deferral.  What is deferral?  A. A deferral is to not let a donor donate for certain reasons.  Q. And as a result of your investigation into these manual payments, was anyone put on deferral status?  A. The donors that were paid—the funds were put on deferral status until I had a chance to speak to them to understand the reason for the extra money being paid to them.  Yes, sir.").

[35] Katie Soles Dep. at 19, ECF No. 49-9.

The explanation accompanying the payments was "Account Correction," but Kitsmiller could see no reason for the donor's account to have needed correction.

Since Plaintiff's login credentials had been used to make the payments, Kitsmiller telephoned Plaintiff directly and asked him whether he had recently made any manual payments. However, Plaintiff denied making any manual payments.[36]

Kitsmiller accordingly flagged the payments to his superiors as being unusual for several reasons, including that Plaintiff denied making the payments; the explanation given for the payments was incorrect, since the account had not needed correction; the timing of the payments was odd, since Donor 1 had not donated plasma recently; and Donor 1 was ineligible to receive payments in any event, since his account was marked "deferred," due to the fact he had failed to provide CSL with a proper address.[37]

The matter was then forwarded to Thixton and Harp for investigation. Thixton obtained a list of all manual payments that had been made from the Greece Center between May 2020, and November 2020, and found payments to fourteen different donors with inadequate explanations, including the series of payments made on November 24, 2020,[38] all having been made using Plaintiff's login credentials. Thixton had all fourteen donor-recipients placed on "deferred" status until he could speak with them about the payments. *See, e.g.*, Thixton Dep. at 98, 101 ("I placed a deferral on the donors that were on the report to speak to me when they came back into the business.

_____

[36] Shannon Attalla Decl., Attachment 1, ECF No. 49-4.

[37] Pl. Response to Def. Stmt. of Facts at ¶ ¶ 66-68, 74.

[38] The 22 payments made on November 24, 2020, were evidently treated as one of the eleven suspicious payments.

28

. . . The donors that were paid --the funds were put on a deferral status until I had a chance to speak to them to understand the reason for the extra money being paid to them.").

On November 27, 2020, Thixton and another CSL ADOQ, Prim Cunningham ("Cunningham"), spoke with Plaintiff by telephone about the suspicious manual payments that had been made from his account, and Plaintiff denied making any of them.  Plaintiff suggested that another employee might have used his password, and stated that he sometimes left his workstation unlocked.

Thixton and Cunningham also reminded Plaintiff that, "as management, he [was] responsible for reviewing the [Jasper] manual payments report," and "questioned why the manual payments from his account for large amounts, to the same donor in some instances, and for [plasma] donations made months prior to the transaction date" had not been brought to Thixton's attention.  On this point, Plaintiff agrees that the Greece Center management was supposed to report unusual manual payments that showed up in the Jasper report to CSL's regional management, Pl. Dep. at 38-42, and, in particular, to Thixton.[39]  Plaintiff denied responsibility for the Center's failure on this point by explaining that he was not the person who usually reviewed the Jasper reports.[40]  However, Thixton and Harp also learned, from speaking to Soles, that Plaintiff had expressly instructed the other Greece Center management staff not to directly report problems to Thixton.  Plaintiff agrees that he gave this instruction, but maintains it was

_____

[39] Pl. Dep. at 38-43.

[40] Plaintiff indicated at deposition that he "inherited" the practice of having the management employee who opened the Greece Center review the Jasper report, which was typically not him. Pl. Resp. to Def. Stmt. of Facts, ¶ 84.

because he was fed up with Soles improperly copying Thixton on matters that did not concern him, as discussed earlier.[41]

Between November 27, 2020, and December 8, 2020, Thixton made multiple attempts to telephone the fourteen recipients of the manual payments.  Thixton was able to determine that the payments to three of the donors, Donor 7, Donor 9, and Donor 10,  had been for legitimate reasons.[42]  As for the remaining eleven donor-recipients, Thixton was able to contact only two of them: Donor 3, who said he did not know who had paid him, and Donor 2, an employee at the Greece Center, who said he "did not want to say" who had paid him.[43]  The remaining nine donors did not respond to Thixtons's calls, and, consequently, they remained on the "deferred" list of ineligible donors.

On December 7, 2020, Thixton and Harp met with Plaintiff at the Greece Center to discuss the manual payments.  Plaintiff again stated that he did not know how the payments could have been made using his login credentials, but suggested that either he had left his computer unlocked and someone had used it while he was away, or that someone had obtained his login information by watching his keystrokes when he logged in.  Thixton and Harp then reviewed the list of unexplained manual payments with

_____

[41] Pl. Dep. at 124, 126-127.

[42] Thixton also determined that the payments to Donors 7 and 10 had been made by Plaintiff, contrary to Plaintiff's assertion that he had not made any manual payments.

[43] Attala Decl., Attachment 1, ECF No. 49-4.

Plaintiff and Soles,[44] and asked whether any of the eleven recipients of the payments had a "rapport" with any Greece Center Staff. Plaintiff denied that was the case, but Soles observed that two of those donor-recipients, Donor 1 and Donor 4, were known to only interact with Plaintiff while at the Greece Center, which Plaintiff did not dispute.[45]

The following day, December 8, 2020, Soles telephoned Thixton and told him that, contrary to Plaintiff's denials during the meeting the previous day, she had personally observed Plaintiff making manual payments, including payments to Donor 1 and Donor 4. Soles further stated that she distinctly recalled Plaintiff making a $100 payment to Donor 1 on one of those occasions.[46]

Thixton and Harp then discussed the investigation findings with Kitsmiller and other CSL staff involved with the investigation, including the fact that, due to the NexLynk program's on-screen encryption function, it would be impossible for someone standing nearby to see another person's login information on the user's computer screen.[47]

---

[44] As discussed further below, during this same meeting, there was discussion of the fact that Soles had made a manual payment from her NexLynk account to an employee-donor who had been waiting in line to donate when his work shift began. Soles indicated that she paid the employee donor as if he had donated, so that he could begin working, and explained that it was her understanding that this practice was followed at other CSL centers. Pl. Dep. 192-193 (discussing the manual payment by Soles). Plaintiff admits that he felt that this type of payment was "fair" and that he had approved of other management staff making similar manual payments. Pl.Resp. to Defs. Stmt. of Facts, ¶ 37. Nevertheless, Harp informed Soles that such a situation was not a proper basis for making a manual payment.

[45] *See*, Attala Decl., Attachment 1, ECF No. 49-4 ("Was noted by the CS [Soles] 2 of the donors on the list Donor 1 and Donor 4 both at times have issues with behavior while at the center and the only management person that will deal with them is Jontus. Jontus stated both are a bit direct at times, however, he handles the situation.").

[46] Soles Dep. at 38-44.

[47] *See,* Attala Decl., Attachment 1, ECF No. 49-4 ("Demonstration of log in provided no possible way someone could see Jontus typing in his password. As soon as the first character is type[d] – a bubble is on the screen.").

31

On December 9, 2020, Thixton checked security camera footage from inside the Greece Center on November 24, 2020, at the time the 22 manual payments had been made to Donor 1, and determined that there had been two employees present, namely, Plaintiff, who had been in his office, and another employee, who had not been observed near a computer.[48]

On December 10, 2020, Thixton and Harp forwarded the results of their investigation to CSL's HR Department, and requested that Plaintiff be terminated.  The following day, December 11, 2020, CSL Senior Human Resources Business Partner Emmanuella Hedge ("Hedge"), terminated Plaintiff's employment for theft.[49]

On March 5, 2021, Plaintiff filed a charge against CSL with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination and retaliation.[50]  On June 30, 2022, the EEOC dismissed the complaint and issued Plaintiff a "right to sue letter."

On September 28, 2022, Plaintiff commenced the instant action.  The operative pleading, Plaintiff's First Amended Complaint, purports to state claims for race discrimination and retaliation under § 1981, Title VII, and NYSHRL.  As will be

_____

[48] Attala Decl., Attachment 1, ECF No. 49-4.

[49] Attalla Decl., Ex. C, Attachment 5.

[50] Attalla Decl., Ex. C, Attachment 9.  The EEOC charge alleged that Plaintiff's firing was discriminatory for the following reasons: Plaintiff was the only black male in management at the Greece Center; there was no evidence he had made the manual payments;  during the investigation of the manual payments, Thixton had subjected a black employee at the Greece Center, Demeris Williams, who apparently was "Donor 2"  mentioned earlier,   to "particularly hostile and aggressive questioning"; two white managers at the Greece Center, Soles and Kimberly Ellis, had made improper manual payments and had not been punished; one of the eleven unexplained manual payments had been to a white employee who had not been questioned during the investigation; and most or all of the donors who had been placed on "deferred" status due to having received improper manual payments were "Black/Hispanic."

discussed further below, the discrimination claim asserts that Plaintiff's firing was motivated in part by racial animus, since, for example, Thixton conducted a rushed, shoddy investigation into the misappropriated funds, because he wanted to fire the only black member of the Greece Center's management, while, at the same time, he did not punish white employees who made improper manual payments.  The hostile-environment claim alleges that Thixton created a racially hostile environment at the Greece Center by treating black employees worse than white employees, by, for example, his "tone" of voice and "word choice" when speaking to black employees, and by selecting black employees to perform cleaning tasks.  The retaliation claim alleges that Plaintiff had told Harp that Thixton "was racist,"[51] and that immediately thereafter Thixton had "doubled down on the mistreatment" of Plaintiff and "black staff."[52]

Following the completion of discovery, Defendants filed the subject Motion for Summary Judgment, ECF No. 49.  As discussed further below, Defendants generally claim that Plaintiff's disparate treatment termination claim is based on hearsay and Plaintiff's "subjective beliefs, unsupported by any objective evidence" that Thixton did anything improper; that Plaintiff's hostile environment claim is "wholly speculative" and unsupported by any evidence; and that Plaintiff's retaliation claim fails because he never engaged in protected activity and has not shown a causal nexus between any such activity and any adverse action by CSL. *See*, ECF No. 49-11 at p. 6 ("Plaintiff bases his claims solely on his subjective beliefs, unsupported by any objective evidence that [Thixton's] conduct was racially motivated."); *see also, id*. at p. 15 ("Plaintiff cannot

_____

[51] Pl. Memo of Law at p. 1.

[52] Pl. Dep. 277.

demonstrate a prima facie case of discrimination, hostile work environment, or retaliation, nor can he establish that the legitimate business reasons for his termination are pretextual.").

Plaintiff opposes Defendants' motion and maintains, as discussed further below, that he has demonstrated triable issues of fact precluding summary judgment as to all his claims. *See, e.g.*, Pl. Memo of Law, ECF No. 53 at 6 ("Plaintiff's immediate supervisor, Defendant John Thixton, subjected Plaintiff to a discriminatory and retaliatory hostile work environment.  Thixton was abusive throughout Plaintiff's employment, but Thixton's hostility significantly increased after Plaintiff told Thixton's supervisor, Rhonda Harp, that Thixton was a racist.  Thixton responded by creating a retaliatory hostile work environment and ultimately terminating Plaintiff following a shoddy and unfinished investigation.") (citations omitted).

The Court has carefully considered the parties' submissions and the entire record.

## DISCUSSION

### I.    Summary Judgment Standards

Defendants have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, which may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).  "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11

34

MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

Additionally, the movant must demonstrate, and not merely assert, that he is entitled to judgment under the relevant principles of law. *See, Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 373 (W.D.N.Y. 2014) ("While the absence of any genuine dispute of material fact is a precondition for summary judgment, the crux of a summary judgment analysis is whether the movant has established entitlement to judgment as a matter of law.") (quoting 11–56 MOORE'S FEDERAL PRACTICE—CIVIL § 56.20 (Matthew Bender 2014)), adhered to on reconsideration, No. 11-CV-6119 CJS, 2016 WL 981858 (W.D.N.Y. Mar. 15, 2016); *see also*, *Darley v. U.S.*, No. 22-CV-00714 (PMH), 2025 WL 1159518, at *3 (S.D.N.Y. Apr. 21, 2025) ("Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law.  Simply put, the movant must separately establish that the law favors the judgment sought.") (citations omitted).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[53] To do this, the non-moving party

---

[53] "The substantive law governing the case will identify those facts which are material and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v. City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

35

must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

"[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion[, but, rather,] [t]he nonmoving party must go beyond the pleadings, and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (citations and internal quotation marks omitted).

Moreover, the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).

The Second Circuit has emphasized that, while summary judgment may be appropriate in employment discrimination cases that turn upon an employer's intent, district courts must proceed cautiously in such cases, given the difficulty that a plaintiff may have in obtaining direct evidence of intentional discrimination:

> We have repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here,

36

the merits turn on a dispute as to the employer's intent.  Indeed, as we have recognized, "clever men may easily conceal their motivations.  Due to the elusive nature of intentional discrimination, plaintiffs must often rely on 'bits and pieces' of information to support an inference of discrimination,.  Because of the likelihood that direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.  The resulting mosaic of intentional discrimination may be sufficient to show discrimination. Nonetheless, even in the discrimination context, a plaintiff must still present more than conclusory allegations to survive a motion for summary judgment.

*Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258–59 (2d Cir. 2023) (citations and internal quotation marks omitted); *see also, Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[W]e are of course mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.  The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.  . . .  [Here,] Meiri has provided no indication that any *evidence exists that would permit the trier of fact to draw a reasonable inference of pretext*. She has offered no evidence suggesting that the INS's treatment of her differed from that accorded other non-Jewish employees; that the INS departed from its general policies in discharging her; or that non-Jewish persons on probation who acted similarly were retained.") (emphasis added, citations omitted); *Kurtanidze v. Mizuho Bank, Ltd*., No. 23 CIV. 8716 (PAE), 2025 WL 1898927, at *12 (S.D.N.Y. July 9, 2025) ("Courts evaluating the sufficiency of evidence on a motion for summary judgment must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation

37

and conjecture.  An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist.") (citations and internal quotation marks omitted), *appeal withdrawn*, No. 25-1958, 2026 WL 362510 (2d Cir. Jan. 6, 2026).

II.     Employment Discrimination

Plaintiff asserts claims of race-based employment discrimination under Title VII, Section 1981, and the NYSHRL, under theories of disparate treatment discrimination, hostile work environment, and retaliation.

> Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment," § 2000e–2(a)(1), the NYSHRL similarly prohibits employers from "discriminat[ing] against such individual in compensation or in terms, conditions or privileges of employment," N.Y. Exec. Law § 296(1)(a), and § 1981 provides that all "persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens," § 1981(a).

*Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015).  Until 2019, discrimination claims under all three statutes were analyzed in the same manner, however, since 2019, claims under the NYSHRL now differ in certain respects which the Court will discuss as necessary below.

*A. Hostile Work Environment*

Plaintiff first maintains that Defendants subjected him to a racially-hostile working environment primarily based on the following: Thixton ordered minority employees to perform cleaning tasks on three occasions; Thixton opened Plaintiff's office door and walked away; Thixton spoke in a rude and condescending tone that Plaintiff believes was worse when directed at black employees; Thixton failed to provide Plaintiff with greater personal assistance in preparation for the Greece Center's audit; Thixton imposed

38

"additional check-ins and extra work" on Plaintiff after the Greece Center failed its audit; Thixton was not as communicative as Plaintiff wished, such as by once delaying an hour to return an urgent phone call; Soles and Shea copied Thixton on communications; Thixton gave coats to three employees at the Greece Center; Thixton communicated management decisions through Soles rather than Plaintiff; Harp rolled her eyes and was "dismissive" of Plaintiff during a conversation; and Plaintiff feared that the avenues for reporting harassment provided by CSL were biased, since HR officials were friendly with Thixton.

Defendants maintain that they are entitled to summary judgment on Plaintiff's hostile environment claim, since "there is no evidence to suggest the conduct complained of was based in racial animus or bias."[54]  Defendants contend, rather, that Plaintiff merely cites "conduct he finds objectionable" "which does not connect to his race in any way."[55] Defendants further argue that Thixton was rarely at the Greece Center in any event, and that his conduct is therefore necessarily "episodic" at most, rather than "sufficiently continuous."[56]

*Hostile Environment Claims Under Title VII and Section 1981*

"Hostile work environment claims . . . under 42 U.S.C. § 1981 . . . can be analyzed pursuant to the core substantive standards that apply to Title VII[.]" *Sanchez-Vazquez v. Rochester City Sch. Dist.*, 519 F. App'x 63, 64 (2d Cir. 2013).  Discrimination prohibited by these statutes

_____

[54] Def. Memo of Law at 21.

[55] Def. Memo of law at 22.

[56] Def. Memo of Law at 23.

39

> encompasses conduct that has the purpose or effect of creating an intimidating or hostile work environment.  Title VII does not set forth a general civility code for the American workplace, but when a workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.

> To prove a hostile work environment in violation of Title VII, a plaintiff must establish both objective and subjective elements. The misconduct shown must have been severe or pervasive enough to create an objectively hostile or abusive work environment, that is, an environment that a reasonable person would find hostile or abusive.  And the victim must have subjectively perceived the environment to be abusive.

> Whether a particular environment is objectively 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  Such circumstances may include but are not limited to the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. No single factor is required.  And there is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim.  The assessment is not, and by its nature cannot be, a mathematically precise test.

> Because the analysis of severity and pervasiveness looks to the totality of the circumstances, the crucial inquiry focuses on the nature of the workplace environment as a whole.

*Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228–29 (2d Cir. 2024) (citations and internal quotation marks omitted).

> As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. However, a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace.
>
> ***
>
> [T]he test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered

40

for the worse. . . . The environment need not be unendurable or intolerable.

*Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (citations omitted).

Importantly, the plaintiff must demonstrate a causal nexus between the alleged hostile work environment and his protected characteristic:

> [I]t is "axiomatic that Plaintiff must establish that the hostile conduct occurred on account of [her protected characteristic] to make out a [race] - based hostile work environment claim." *Johnson v. City of New York*, No. 10 CIV. 6294, 2012 WL 1076008, *6 (S.D.N.Y. Mar. 28, 2012) (citing *Thompson v. N.Y.C. Dep't of Prob.*, 348 Fed. Appx. 643, 646 (2d Cir. 2009)). Courts regularly grant summary judgment when there is no "causal connection" between the alleged hostile acts and the protected characteristic.

*Stern v. McDonough*, No. 5:18-CV-71 (MAD/TWD), 2022 WL 4236298, at *7 (N.D.N.Y. Sept. 14, 2022) (collecting cases); *see also, McDonald v. Pharney Grp. LLC*, No. 23-CV-06025 (JAV), 2026 WL 787750, at *5 (S.D.N.Y. Mar. 20, 2026) ("Incidents, however abusive, that are not protected class-related are not relevant to establish a claim of a hostile work environment.") (citation and internal quotation marks omitted).

As mentioned, earlier, Title VII "does not set forth a general civility code for the American workplace,[57]" and Courts consistently find that rude and obnoxious behavior by supervisors, particularly where it is facially neutral concerning a plaintiff's protected status, fails to amount to a hostile work environment as a matter of law. For instance, another district court recently cited a plethora of cases on this point, stating:

> [T]he only behavior directed at Kenny consisted of rudeness or discourtesy. *See, e.g.,* Kenny Dep. at 139–40 (Sullivan rolled his eyes when Kenny spoke, interrupted her, and was disrespectful). But a supervisor's rudeness to an employee does not equate to a hostile work environment under Title

---

[57] *See, e.g, Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024)

VII. *See Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (internal quotation marks omitted) ("Title VII is not a general civility code but rather forbids only behavior so objectively offensive as to alter the conditions of the victim's employment."); *see, e.g., Mathirampuzha*, 548 F.3d at 73, 79 (incident where plaintiff's supervisor "grabbed the plaintiff's arm, punched him in the shoulder and chest, spit in his face, and poked him in the eye" and "shouted" at him was "not so severe as to alter materially the plaintiff's working conditions"); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (no hostile work environment where "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her"); *Littlejohn*, 795 F.3d at 321 (allegations that employer made negative statements about plaintiff, was impatient and used harsh tones, distanced herself and declined to meet with plaintiff, required plaintiff to recreate work, wrongfully reprimanded plaintiff, increased plaintiff's schedule, and was sarcastic to plaintiff insufficient to support severe or pervasive hostile work environment); *Shultz*, 867 F.3d at 308–09 ("uncomfortable incidents" taken together, were not sufficiently pervasive to raise a triable issue of fact as to hostile work environment where superior disparaged pregnant plaintiff on a phone call, her name was removed from wall and newsletter, and colleagues did not speak to her).

*Kenny v. Cath. Charities Cmty. Servs. Archdiocese of New York*, No. 20CIV3269PAERWL, 2023 WL 1993332, at *21 (S.D.N.Y. Feb. 14, 2023).

Applying the foregoing principles, the Court here finds that Defendants are entitled to summary judgment on the Title VII/Section 1981 hostile environment claims, since even viewing the record in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, no reasonable juror could find that Plaintiff was subjected to conduct that was sufficiently severe or pervasive to create a hostile work environment. In this regard, Thixton was present at the Greece Center on five occasions at most over a period of ten months, and Plaintiff has identified only a handful of facially-neutral, isolated incidents that were clearly episodic rather than continuous and concerted. Moreover, the

42

"[t]he gravamen of [Plaintiff's] claims is rooted in conduct that amounts to nothing more than workplace dynamics—that is, personal enmity or personality conflicts." *Davis-Molinia v. Port Authority of New York and New Jersey*, No. 08 CV 7584 GBD, 2011 WL 4000997, at *11–12 (S.D.N.Y. Aug. 19, 2011), *aff'd*, 488 F. App'x 530 (2d Cir. 2012).

Particularly regarding Plaintiff's claim that Thixton made him perform menial cleaning chores, the Court finds that Plaintiff being told, during sporadic visits by his regional supervisor, to perform cleaning tasks on three occasions over the course of a year, at a medical facility open to the public at which, pursuant to the express terms of his job description he admittedly had the responsibility for ensuring cleanliness,  does not amount to conduct "so objectively offensive as to alter the conditions of the victim's employment."

Nor has Plaintiff presented sufficient evidence to allow a reasonable jury to infer that any of the complained-of acts resulted from racial animus.  Significantly, on this point, Plaintiff's mere belief that he was discriminated against is not evidence of discrimination. *See, e.g., Williams v. Westchester Med. Ctr. Health Network*, No. 21-CV-3746 (KMK), 2024 WL 990153, at *9 (S.D.N.Y. Mar. 7, 2024) ("Plaintiff's allegations concerning his belief that race and gender played a role in his firing or other treatment at work remain insufficient to make out a plausible discrimination claim. *See Doe v. Hamilton Coll.*, No. 21-CV-436, 2023 WL 8782020, at *24 (N.D.N.Y. Dec. 19, 2023) ("A plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination.") (alteration adopted) (quoting *Brodt*, 4 F. Supp. 3d at 568).") (emphasis in original).

43

Nor can Plaintiff rely on speculation about Thixton's motive to create a triable issue of fact. *See, Phillips v. Fashion Inst. of Tech*., No. 23-375-CV, 2024 WL 1005500, at *2 (2d Cir. Mar. 8, 2024) ("The District Court did not err in dismissing Phillips's discriminatory hostile work environment claims against all parties arising from the May 2019 incident. Phillips adduced no evidence that Barton's threats were motivated, even in part, by racial discrimination. The threats were facially race-neutral, for example, and Phillips's only evidence to support her claim of racial discrimination is her testimony that she had "never seen [Barton] act that way with a white person." Phillips's speculation about Barton's motivation does not raise a genuine dispute of fact that defeats summary judgment. *See Tassy v. Buttigieg*, 51 F.4th 521, 534 (2d Cir. 2022).") (citation to appellate record omitted).

Here, for example, Plaintiff's assertion that he never saw Thixton tell any white employees to perform the same cleaning tasks,[58] and his opinion that Thixton's normally rude, condescending and dismissive "tone" was worse when speaking to black employees, do not create a triable issue of fact as to whether Thixton was motivated by racial animus. Indeed, Plaintiff admits that he did not report the alleged cleaning incidents to HR as racial discrimination precisely because he was unsure of Thixton's motive for giving the instructions. While Plaintiff now contends that he eventually decided Thixton was a racist, the additional "evidence" upon which he relies to reach that opinion, consisting primarily of his belief that Thixton was relatively ruder and more

_____
[58] Plaintiff testified at deposition, however, that during the Covid-19 Pandemic, Thixton directed all employees to be involved in performing hourly cleaning at the Greece Center.

condescending toward black employees, is not legally sufficient to support a reasonable inference that Thixton was motivated by racial bias. [59]

Neither is Plaintiff's unsupported belief that the complained-of aspects of Thixton's styles of managing and communicating were intended to undermine his authority as Center Manager due to his race.  For example, no reasonable inference of racial animus can be drawn merely from the fact that Thixton preferred to communicate through Soles, who is white, rather than Plaintiff.  It is undisputed in the record that Soles had been employed at CSL longer than Plaintiff and was more familiar with the Greece Center and CSL's procedures than Plaintiff, who was still undergoing training throughout most of his brief tenure at CSL.  Furthermore, Plaintiff admits that he does not know whether it was Soles or Thixton who initiated this communication pattern. Additionally, Plaintiff admits that some of the communications about which he complains involved medical equipment at the Greece Center, and that Soles was the person at the Center who typically dealt with equipment.  Also, the record suggests that Thixton may have simply liked Soles better, since Plaintiff refers to Soles as one of Thixton's "favorites."  In any event, the fact that Thixton may have preferred communicating through Soles does not reasonably suggest racial animus.

_____

[59] In addition to claiming that Thixton used the gift of coats to three Greece Center employees to undermine his authority, he alternatively asserts that Thixton's gift of the coats is also evidence of racial animus more generally, since Thixton did not give a coat to any black *male* employee. Pl. Dep. 100. Defendants respond that no male employees received coats, since Thixton only had three *womens*' coats that were leftover from a regional CSL meeting he attended.  Plaintiff admits he has no evidence that the coats were not womens' coats, Pl. Dep. at 101, but nevertheless argues that Thixton is lying about the coats having been left over from a meeting, and that Thixton must have intentionally purchased the three jackets.  However, it is evident from Plaintiff's deposition testimony that he has no personal knowledge to disprove Thixton's version of events. *See*, Pl. Dep. at 102-103.  For instance, Plaintiff offers no reason to think he knows every regional meeting that Thixton ever attended, and whether or not company merchandise was left over from any such meeting.  In any event, even assuming *arguendo* that Thixton specifically purchased the jackets for the three employees as Plaintiff asserts, the Court finds that such incident would not in any way help establish an inference that Thixton was motivated by racial animus.

Plaintiff's apparent belief that Thixton would have provided more personal assistance to him during preparation for the Center's audit, or returned his phone calls sooner, if he was white is similarly unsupported and speculative.  So is his suspicion that Thixton bought coats for select employees in order to undermine his authority.

Plaintiff's subjective fears that HR employees would be biased against him if he complained are similarly unsupported and insufficient to show either a hostile environment or racial bias.

*Hostile Environment Under NYSHRL*

Plaintiff's claims arose after 2019, and, accordingly, "pursuant to the 2019 amendments to the NYSHRL, stating a hostile work environment claim under NYSHRL now requires only that the plaintiff plead sufficient facts showing she was "subjected to inferior terms, conditions, or privileges of employment" due to her membership in a protected class."  *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 246 (S.D.N.Y. 2024) (citation and internal quotation marks omitted).[60]  This more-lenient standard does not require that the alleged misconduct be severe or pervasive to establish an actionable hostile environment.[61]

_____

[60] The Second Circuit has indicated that this change was meant to align the NYSHRL's hostile environment standard with the "more liberal" standard under the New York City Human Rights Law ("NYCHRL"). *See, Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122–23 (2d Cir. 2024)  ("The NYSHRL historically utilized the same standard as Title VII, but it was amended in 2019 to align with the NYCHRL's more liberal pleading standard. *See* N.Y. Exec. Law § 300 (requiring that the NYSHRL be construed "liberally for the accomplishment of the remedial purposes thereof").")

[61] *See, e.g., Kassaw v. Wal-Mart Corp.*, No. 6:23-CV-06181 EAW, 2026 WL 860471, at *8 (W.D.N.Y. Mar. 30, 2026) ("On October 11, 2019, the NYSHRL was amended with respect to hostile work environment claims to remove the "severe or pervasive" requirement. It is unclear whether the standard for a NYSHRL hostile work environment claim is co-extensive with a claim under the NYCHRL, but "district courts have generally agreed that the amended NYSHRL standard is, at the very least, closer to the NYCHRL standard—which requires only that the plaintiff's employer treated [him] less well than other employees, at least in part for a discriminatory reason." *Kittle*, 2025 WL 2721620, at *9 (quotations and citation omitted).").

However, even under this more liberal standard, the NYHRL, like Title VII, is not a "general civility code," and "petty slights or trivial inconveniences" are not actionable. *Cf., Doolittle v. Bloomberg L.P.*, No. 22-CV-09136 (JLR), 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023) ("[T]he NYCHRL is not a "general civility code." *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 (1st Dep't 2009)). For Doolittle's NYCHRL claim to survive as to her age-discrimination allegations, she must allege "differential treatment that is 'more than trivial, insubstantial, or petty.'" *Torre v. Charter Comm'cns, Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015))."); *see also, McIntosh v. City of New York*, 247 A.D.3d 1171, 1174–75, 253 N.Y.S.3d 713, 718 (2d Dept. 2026) (Stating that under NYCHRL, "mere personality conflicts will not suffice to establish a hostile work environment.").

Additionally, the plaintiff must still demonstrate that he was subjected to inferior conditions "because of" his race. *See, e.g., McDonald v. Pharney Grp. LLC*, No. 23-CV-06025 (JAV), 2026 WL 787750, at *6 (S.D.N.Y. Mar. 20, 2026) ("[Executive Law] section 296(h)(1) still requires that any harassment be attributable to Plaintiff's protected characteristics."); *see also*, *Doolittle v. Bloomberg L.P.*, 2023 WL 7151718, at *7 ("[Plaintiff] must also allege that her [protected characteristic] "was one of the motivating factors, even if it was not the sole motivating factor, for" her unequal treatment. *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40 (1st Dep't 2012).")

Even under this standard, the Court finds that Defendants are entitled to summary judgment on Plaintiff's NYSHRL hostile environment claim. In this regard, Plaintiff alleges that he was treated less well than white employees due to his race, primarily since he

47

never saw Thixton tell a white employee to perform menial cleaning tasks, and since he subjectively perceived Thixton's tone as being "more condescending and rude" when speaking to black employees.  However, Plaintiff has not raised a triable issue of fact as to whether he was subjected to inferior terms, conditions, or privileges of employment due to his race.  Rather, Plaintiff's combined alleged incidents of unequal treatment amount to nothing more than petty slights and trivial inconveniences connected to Thixton's management and communication styles.

Additionally, Plaintiff relies only on speculation and subjective feelings about Thixton's motivation, as opposed to evidence from which a reasonable inference of racial bias can be drawn. *See, e.g., Itwaru v. New York City Dep't of Health & Mental Hygiene*, No. 1:24-CV-02020 (JHR) (SDA), 2025 WL 2933591, at *11 (S.D.N.Y. July 29, 2025) ("With respect to Plaintiff's allegations of generally feeling disrespected and undermined, such subjective feelings alone do not plausibly allege a claim; she must plausibly allege objective facts in order to state a NYCHRL hostile work environment claim."), report and recommendation adopted, No. 24 CIV. 2020 (JHR) (SDA), 2025 WL 2555970 (S.D.N.Y. Sept. 5, 2025); *see also, Robinson v. De Niro*, 739 F. Supp. 3d 33, 118 (S.D.N.Y. 2023) (Indicating that for a NYCHRL hostile environment claims, the "Plaintiff nonetheless has the burden of showing that the conduct complained of was caused by a discriminatory motive; it is not enough that a plaintiff has an overbearing or obnoxious boss.") (citation and internal quotation marks omitted).

### B.  Disparate Treatment Employment Discrimination

Plaintiff next maintains that his firing was racially discriminatory, since his race was a motivating factor in the decision.  "Title VII, § 1981, and NYSHRL discrimination

claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Tolbert v. Smith*, 790 F.3d at 434 (citation omitted).

> At the first step of *McDonnell Douglas*, the plaintiff must "establish a prima facie case by showing that: (1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered [an] adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014) (internal quotation marks omitted). At the second step, "the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action." *Id*. And at the third step, "the burden shifts back to the plaintiff to prove discrimination, *for example*, by showing that the employer's proffered reason is pretextual." *Id*. (internal quotation marks omitted).

*Allen v. Padilla*, No. 25-623, 2026 WL 123234 (2d Cir. Jan. 16, 2026) (emphasis added).

Although,

> [i]n [disparate treatment] discrimination cases under the NYSHRL and Title VII, courts may apply a "mixed motive" analysis at the third stage of the *McDonnell Douglas* framework. "[A] plaintiff may make either a traditional showing of 'pretext'—*i.e.*, that the employer's stated reason was false, and that the sole actual reason was discrimination—or a showing that even if the employer's reason is true, discrimination was still a motivating factor in the employment decision." *Bart v. Golub Corp*., 96 F.4th 566, 573–74 (2d Cir. 2024) (emphasis in original).

*DeGroat v. Sullivan Cnty.*, No. 23-CV-2066 (KMK), 2025 WL 2733632, at *7, n. 6 (S.D.N.Y. Sept. 25, 2025); *see also*, *Bart v. Golub Corp*., 96 F.4th at 575 ("[A] Title VII plaintiff need not prove that the employer's stated reason was false. A plaintiff instead need only show that the employer's stated reason—even if true or factually accurate— was not the "real reason," in the sense that it was not the entire reason due to a coexisting impermissible consideration.").

In this regard, where the defendant has demonstrated a legitimate non-discriminatory reason for the adverse action, the plaintiff "must produce not simply 'some' evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were [either] false [or at least not the entire reason,] and that more likely than not discrimination was [at least one of the motivating factors] for the employment action." *Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 365 (2d Cir. 2025) (citation and internal quotation marks omitted).

In this action, Defendants maintain that they are entitled to summary judgment on Plaintiff's discrimination claim, purportedly because Plaintiff cannot demonstrate a prima facie case, since he cannot show the fourth element, namely, that the termination of his employment "occurred under conditions giving rise to an inference of discrimination." Rather, Defendants contend that Plaintiff was indisputably terminated for misappropriation of funds.  Alternatively, Defendants maintain that even if Plaintiff can state a prima facie case, they have come forward with a legitimate non-discriminatory reason for firing him, and he cannot show either that such proffered reasons is false, or that racial animus was a motivating factor in the decision, since "the record is devoid of any evidence that [Plaintiff] was ever treated differently because of his race." ECF No. 49-11 at p. 16.  On this point, Defendants note, for example, that around the same time that Plaintiff was fired, CSL also fired two other employees at different centers, one white and one black, for making improper manual payments.

In opposition, Plaintiff maintains that he has shown both that his firing occurred under conditions giving rise to an inference of discrimination, and that race was a motivating factor in the firing.  In this regard, Plaintiff contends that the racial component

50

of Defendants' decision to fire him is shown by both the circumstances surrounding the investigation into the manual payments, and by Defendants' alleged mistreatment of him before the manual payments were discovered, discussed earlier.

### 1. Defendants' Investigation into the Manual Payments

Beginning with the circumstances surrounding the investigation, Plaintiff maintains that the investigation was "shoddy and unfinished," which suggests that Thixton, motivated by racial animus, was anxious to fire Plaintiff even before the investigation was completed.  On this point, Plaintiff states:

> [Thixton] jumped the gun and terminated Plaintiff before finishing the investigation.  It is undisputed that on December 10, 2020, Defendants decided to terminate Plaintiff.  But the following day, Thixton emailed one of Plaintiff's trainers asking if she had gone over 'donor payments and the reports associated with reviewing manual payments' with Plaintiff—the essence of the case against Plaintiff.  She responded the following day that she did not know.  Thixton contacted Plaintiff's other trainer on December 13 but did not get an answer until December 14.  This creates genuine issues of material fact as to whether an unlawful animus motivated Thixton to terminate Plaintiff before he confirmed that Plaintiff had been trained on a central aspect of the investigation.

ECF No. 53 at p. 21.

Plaintiff further contends that the investigation was incomplete when he was fired, since Thixton had not yet spoken with nine of the eleven donor-recipients.  Plaintiff asserts that if Thixton had spoken with those donor-recipients, he might have discovered that some or all of those payments were "explainable." ECF No. 53 at p. 22.  Plaintiff implies, however, that Thixton avoided contacting those donors since he wanted to fire Plaintiff due to racial animus.

Similarly, Plaintiff further maintains that it was improper for CSL to rely on Soles' statement that she observed Plaintiff make a manual payment to Donor 4, since Thixton

51

never spoke with Donor 4 about the payment. *See*, ECF No. 53 at p. 24 (Asserting that CSL "overplayed its hand" by relying on Soles' statement, since "Defendants never spoke with Donor 4 in the investigation.").

Plaintiff further contends that the outcome of the investigation was unreasonable, purportedly since it relied merely on the fact that his "credentials" were used to make the manual payments. *See*, ECF No. 53 at p. 23 ("No witness testified to receiving payments from Plaintiff, and it is undisputed that Defendants failed to speak with Donor 1.  To get around this problem, Defendants bring circumstantial evidence that Plaintiff's credentials were used to make the payments at issue.  This does not establish that Plaintiff made the payments[.]").

Plaintiff also suggests that Thixton ignored evidence indicating that another manager at the Greece Center, "Former Employee 3," who "was known to act erratically," used Plaintiff's login credentials to make the manual payments. *See*, ECF No. 53 at p. 23 ("Former Employee 3 was known to act erratically.  Soles would stay late to make sure Former Employee 3 didn't cause any issues at the Center.  There were rumors that she had substance abuse problems.").

Plaintiff also contends that the investigation was "riddled with errors," which again shows racial animus.  In particular, Plaintiff contends that the investigative report refers, at one point, to $1,515.00 in questionable payments having been made, while the investigation ultimately showed unexplained payments by Plaintiff totaling less than that amount. *See*, ECF No. 53 at p. 22 ("The basis for determining that Plaintiff made improper payments is flimsy.  According to the "Report" requesting [Plaintiff's] termination, almost half of [Plaintiff's] improper manual payments ($735 out of $1,515) were issued to Donor

1.   But the report is so slopy [sic] that Thixton admitted that the total amount was not $1,515.  Defendants now vaguely assert that 'over $1,000' was misappropriated.  Hence, Defendants still cannot specify what Plaintiff did wrong.").

Plaintiff similarly contends that CSL provided inconsistent reasons for firing him, which suggests racial animus.  In particular, Plaintiff notes that some of the documents in the record refer to him being fired for "theft," while others refer to him being fired for "misallocation of funds," and still others refer to "misappropriation of funds." *See*, ECF No. 53 at p. 23 ("This inconsistency in the ostensible legitimate reasons for firing Plaintiff creates further questions as to the real reason for Plaintiff's termination.").

Plaintiff further contends that the investigation selectively focused on him, because he is black, while it ignored white employees who admittedly made improper manual payments.  Specifically, Plaintiff asserts that,

> Katie Soles, also a supervisor, improperly issued manual payments around the same time as Plaintiff.  She made improper manual payments, including multiple payments to the same individual on the same day.  [But,] she was not disciplined and was even promoted a few months after Plaintiff's termination.

ECF No. 53 at p. 13.

Plaintiff also maintains that it was racist for Thixton and Harp to have included Soles in a meeting concerning the payments, since Soles was Plaintiff's subordinate and white, and the investigation concerned himself, who is black. *See*, Pl. Dep. at pp. 137-138 ("I felt like this was excessively racist.  They have me and Katie in a room and they are questioning me on manual payments in front of Katie.  Katie is two levels subordinate to me.  And, you know, they are – they're reviewing what they're accusing me of in front of her.").

Plaintiff also alleges that Thixton conducted the investigation in a racist manner, by treating Plaintiff differently than he would have treated a white person. In particular, Plaintiff asserts that Thixton "circumvented" him, by preventing him from participating in the investigation of the payments. *See*, Pl. Dep. at 89-90 ("And I feel like he kind of circumvented me on that, you know, too, 'cause he, -- I was trying to make him reconcile, you know, what was happening so that I could defend myself 'cause I didn't feel like I had a sufficient defense. And I wanted to, you know, like, what I needed to do to kind of protect myself. And I didn't really get any – any help from him."). Plaintiff alternatively states that Thixton "ostracized" him from the investigation. *See*, Pl. Dep. at p. 289 ("I think kind of even the way the investigation was done. I felt like I was ostracized from that. You know, I think I could have—I think had he not gone about the investigation the way that he did, I think I could have helped provide more value to the investigation[.]").

Plaintiff further maintains that Thixton acted with racial bias during the investigation, by placing the donor-recipients of the subject payments, several of whom were minorities, on the deferred list until Thixton could speak with them.[62]

Plaintiff also argues that CSL's contemporaneous firing of two other employees,

_____

[62] Pl. Dep. at pp. 78-81 (The testimony indicates that some of the donors that were put on deferred status were minorities). Plaintiff also asserted during his deposition that all minority employees who were "associated with the improper payments in some way or form were terminated." Pl. Dep. at 79 (referring to employees who were paid the improper payments). However, his testimony indicates that he has no firsthand knowledge about whether such people were terminated. Pl. Dep. 79; *see also, id*. at 81 ("[T]hey were deferred because they were associated with the improper payments in some way. To my understanding."). Plaintiff also asserted that the minority employee donors were fired "and the white counterparts weren't," but, again, he provides no support for that bald assertion, such as who the "white counterparts" were or how they were similarly situated to any black employee, and his testimony as a whole indicates that he has no personal knowledge of such matter. *See, e.g.*, Pl. Dep. 78-81.

one white and one black, for misappropriation of manual-payment funds,[63] is evidence of racial animus, since one of those employees was also black. *See*, ECF No. 53 at p. 13 ("[T]his compounds [Defendants'] problem because it indicates that two thirds of the employees terminated on this basis were Black.").  Plaintiff also argues that the white employee was fired for misappropriating a much larger amount of money than he was, which suggests that CSL was slower to fire the white employee. *See*, ECF No. 53 at pp. 13-14 ("[The two black center managers were fired for misappropriating $800 and over $1,000, respectively.] In contrast, it is undisputed that [the white employee] made $26,930 in manual payments and was caught on camera doing so.  This creates a question for the jury to determine—whether the threshold for terminating a Black employee was lower than the threshold for terminating a white employee."); *see also, id*. at pp. 20-21 ("[Plaintiff] has also demonstrated that Black employees were fired for alleged misallocations of funds that were much smaller than what it took for white employees to be fired.").

However, the Court finds that Defendants are entitled to summary judgment, since none of the alleged circumstances of CSL's investigation cited above by Plaintiff, either singly or in combination, allow a reasonable inference to be drawn that Plaintiff's race was a motivating factor in the decision to fire him.

As a preliminary matter, Plaintiff's assertion that CSL fired him simply because his login credentials were used is clearly contrary to the record.  Plaintiff maintains that CSL had no other evidence tying him to the payments, but that is incorrect, since, in addition

_____

[63]On November 18, 2020, CSL terminated a white Reception Technician at the Highland Park, Michigan, plasma collection center for misappropriation of funds.  On January 28, 2021, CSL terminated a black Senior Reception Technician at the York, Pennsylvania, collection center.  In both of these cases, the inappropriate manual payments were discovered by CSL Business Technology employee Scott Kitsmiller ("Kitsmiller"), whose responsibility was to flag suspicious manual payments.

to the fact that Plaintiff's login credentials were used, CSL had other evidence, including video footage, showing that Plaintiff was one of only two employees at the Greece Center, and the only one observed near a computer, when the payments were made to Donor 1; that Plaintiff had a particular rapport with Donor 1 and Donor 4 (even though he initially denied that any staff member had a rapport with any of the eleven donors); that Soles saw Plaintiff make a manual payment to Donor 4; and that Plaintiff never notified Thixton of any of the questionable payments made from his account over a period of months, even though, as Center Manager, he was ultimately responsible for reviewing the Jasper report, and, additionally, that he had forbid any other member of the Greece Center management from contacting Thixton directly.  This evidence, taken together, provides very strong circumstantial evidence that Plaintiff made the improper payments.  But, in any event, even if CSL had fired Plaintiff simply because his login credentials were used to make the payments, such fact would not reasonably suggest racial animus.

Nor does the Court find any merit to Plaintiff's contention that it was improper for CSL to rely on Sole's statement that she witnessed Plaintiff making a manual payment to Donor 4.[64]  Plaintiff asserts that CSL should have first spoken with Donor 4 to corroborate Sole's statement, and that the failure to do so is indicative of racial animus.  However, it is undisputed that Thixton attempted to contact Donor 4, but was unable to do so.[65]  The same is true of the other donors whom Thixton was unable to reach.  No reasonable

_____

[64] Soles testified at deposition that she observed Plaintiff make manual payments to Donor 1 and Donor 4.

[65] *See, e.g.*, Plaintiff's Response to Defendants' Statement of Facts, ¶ 77 ("Defendants attempted to reach out to them, [referring to the donor recipients] but only successfully contacted Donors 2, 3, 7, 9, and 10.").

inference of racial animus can be drawn from Thixton's inability to contact Donor 4 or any of the other donors-recipients, since he had no control over whether they answered or returned his telephone calls.[66]

Plaintiff's contention that Thixton ignored evidence that someone else, namely, Former Employee 3, used Plaintiff's login credentials to make the improper payments is similarly meritless, since there is no evidence to support that theory. Plaintiff relies merely on testimony that prior to her quitting or being fired, Former Employee 3 had acted erratically, presumably due to either mental illness or drug usage. However, from such information, no reasonable inference can be drawn that Former Employee 3 used Plaintiff's personal login information to make the manual payments. Indeed, the undisputed testimony indicates that Former Employee 3's alleged erratic behavior consisted in part of not being able to remember her own login credentials, let alone someone else's.[67] Nor, was Former Employee 3 observed to have access to a computer when the payments were made to Donor 1,[68] nor did anyone observe her making manual payments. Further, Plaintiff admits that during the investigation he never suggested that Former Employee 3 or any other employee had used his password, since he had no

_____

[66] Furthermore, even if Thixton had spoken to more donors and determined that additional payments had been for proper reasons, that would still not address the problem that Plaintiff denied making any such payments.

[67] *See*, Soles Deposition at p. 17 ("She [(Former Employee 3)] would constantly forget her—her log-in information. So as the manager on duty, if you're unable to log in to a computer, you're unable to perform your duties. And so she would get herself locked out of her computer, and then would be unable to perform her job as a manager. So I would stay [later] so that staff had a manager that they could rely on to help them.").

[68] The investigative email chain refers to an "MOS," which the Court assumes means Medical Operations Supervisor, being present at the center along with Plaintiff on November 24, 2020, when the manual payments were made to Donor 1, but not having access to a computer. Attalla Decl., ECF No. 49-4. Since Former Employee 3 is referred to as a Medical Operations Supervisor, *see*, Pl. Dep. at p. 97, the Court assumes that the MOS is the same person as Former Employee 3.

evidence of that. *See*, Pl. Dep. at 258 ("I didn't have sufficient evidence to do that.").[69] Plaintiff's argument on this point is completely speculative since, apart from Plaintiff's denials, the record contains no evidence that anyone but Plaintiff used his login credentials.

Plaintiff's assertion that he was terminated before the investigation was complete is similarly unsupported.  Plaintiff maintains that Thixton acted improperly by requesting that Plaintiff be terminated before confirming that Plaintiff had been trained regarding "donor payments and the reports associated with reviewing manual payments," which Plaintiff contends was "the essence of the case against [him]."  However, the essence of the case was not whether Plaintiff had been trained to make manual payments, but whether he made unauthorized manual payments and then lied about it.  While Thixton may not have been sure about the former, CSL had substantial evidence of the latter. Furthermore, Plaintiff never claimed during the investigation that he was unaware of how to make manual payments, he merely claimed that he had not made any.[70]   And, in any event, Plaintiff admits that he was trained concerning manual payments.[71] In sum, this argument, too, fails to suggest that race was a motivating factor.

The Court similarly finds that no reasonable inference of racial bias can be drawn from Plaintiff's contention that Defendants' investigation was "riddled with errors."  Those

_____

[69] *See*, Pl. Dep. at 258 ("Q. Did you identify any specific employee that you felt might have misappropriated your log-in information to Ms. Harp or Mr. Thixton?  A. No. I didn't have sufficient evidence to do that.").

[70] If Plaintiff actually had been unaware of how to make manual payments, despite having received months of training on all aspects of the job, as the record indicates he received, one can assume that he would have informed Thixton and Harp of the fact that he was incapable of committing the wrongdoing of which he felt he was being wrongly accused.

[71] *See, e.g.*, Pl. Dep at pp. 26-42; *see also*, Pl. Response to Def. Stmt. Of Facts, ¶ 34.

errors, according to Plaintiff, consisted of misstating the total amount of unexplained manual payments, and referring to his alleged misconduct inconsistently as "theft," "misallocation of funds," and "misappropriation of funds."  However, Plaintiff's argument about the terms used to describe the misconduct is specious, since the terms "theft," "misallocation of funds" and "misappropriation of funds" are essentially synonymous in this context.  Even if they are not, such a minor discrepancy in terminology does not suggest a racial motive.  As for the dollar amount of unexplained manual payments, Plaintiff is correct that Defendants' investigative email chain refers to a total sum of $1,515.00, but that was before Thixton determined that the payments to Donors 7, 9, and 10 had been for legitimate reasons.  Moreover, the record does not indicate that Plaintiff was fired for misappropriating a specific sum of money.  Consequently, any discrepancy on this point fails to suggest that Plaintiff's race was a motivating factor in the decision to fire him.

Similarly baseless is Plaintiff's suggestion that Thixton acted with racial bias during the investigation by placing the donor-recipients of the subject payments on the deferred list until he could speak with them, since several of the donors were minorities.  Plaintiff has not shown that Thixton was aware of the race of the particular donors, or that he treated any white donor on the list differently, and, in any event, no inference of racial bias can reasonably be drawn from the mere fact that Thixton placed all recipients of the improper payments on deferred status until he could speak with them about the payments.  In that regard, Plaintiff admits that CSL could "essentially defer somebody for any reason,"[72] and he offers no reason why it would be unreasonable or a violation of

_____

[72] Pl. Dep. at 80.

established procedures for CSL to defer a donor suspected of receiving improper payments pending an investigation.[73]

Finally, the Court finds no merit to Plaintiff's contention that he was treated differently than white employees during the investigation.  On this point, Plaintiff first contends that Soles, who is white, also made improper manual payments, but was not fired.  However, it is clear from the record that Plaintiff and Soles were not similarly situated.  Not only did Plaintiff and Soles hold different titles, but Soles openly admitted to making manual payments to a particular donor for a clearly defined reason,[74] namely, that due to the Center's error, the donor had lost a significant amount of his red blood cells during a donation, which resulted in him being unable to donate again for an extended period of time, which resulted in a financial loss to him.[75]  Furthermore, when Harp explained to Soles that, despite the reason for the payment, it was nevertheless incorrect, Soles accepted the correction.[76]   Obviously, that is quite different than what Plaintiff is alleged to have done, namely, having made far more numerous unexplained payments he denied making.  Plaintiff's contention on this point is meritless.

Plaintiff also maintains that it was "racist" for Thixton and Harp to include Soles, who is white, in a meeting concerning the flagged manual payments, since he, a black

_____

[73] *See*, Pl. Dep. at 81 ("They were deferred because they were associated with the improper payments in some way.  To my understanding.").  Despite Plaintiff's vague language here, the record is clear that the "some way" in which the deferred donors were "associated" with the improper payments is precisely that they were the recipients of the improper payments.

[74] Pl.Dep. at p. 192.

[75] Pl. Resp. to Def. Stmt. Of Facts at ¶ ¶ 36-37, 114-118.

[76] Pl. Resp. to Def. Stmt. Of Facts at ¶ ¶ 117-118.

man, was suspected of making the payments, and Soles was his subordinate. However, Plaintiff admits that the reason Defendants gave for including Soles in that meeting is true, namely, that Soles had made a questionable manual payment for which Thixton and Harp wanted an explanation.[77]  Neither does Plaintiff dispute Defendants' contention that Soles was also included in the meeting because she was familiar with the donors who had received the other unexplained payments.[78]  And, as it turned out, Soles' familiarity with the donors enabled her to inform Harp and Thixton that Plaintiff had a particular rapport with certain donors on the list, despite Plaintiff's initial denial of such fact.  This incident in no way suggests racial animus.

Plaintiff also contends that Thixton "circumvented" and "ostracized" him during the investigation into the manual payments, by preventing him from having a bigger role in the investigation, which, he suggests, Thixton would not have done to a white employee. However, the Court finds no merit to this argument, since it is unreasonable for Plaintiff, who obviously was the primary subject of the investigation for all the aforementioned reasons, including that his login information was used to make the payments and another employee reported witnessing him make some of the payments, to think that he should have played some larger, unspecified role in the investigation, particularly when he insisted that he had no involvement with or information about the payments.  Indeed, Plaintiff admits that he wanted more involvement in the investigation just so that he could

_____

[77] *See*, ECF No. 54 at ¶¶ 106-107, Pl. Resp. to Def. Stmt of Facts; *see also*, Harp Dep. at pp. 129-130.

[78] Harp Dep. at pp. 129-130.

"protect himself."[79] But, in any event, Plaintiff has not shown or even alleged that Thixton ever treated any similarly-situated white employee differently during an investigation into alleged malfeasance by that employee.

Plaintiff also asserts that Defendants treated a white Center Manager at a different Center more favorably than him, since it fired the white manager for misappropriating a much greater sum of money ($26,930), which, according to Plaintiff, shows that Defendant allowed the white manager to commit more misconduct before firing him than it allowed Plaintiff to commit. Plaintiff also contends that Defendants contemporaneously fired two black employees and one white employee for the same misconduct, which suggests racial animus toward blacks. However, this first argument is meritless, insofar as it implies that CSL let the white employee get away with stealing funds for a longer time, or in greater amounts, than black employees, before firing him, since the record indicates that the white employee's theft of the $26k occurred by multiple transactions processed on the same day, November 13, 2020, and the employee was fired as soon as the payments were discovered.[80] Moreover, the fact that CSL fired two other employees for misappropriation of funds at around the same time as Plaintiff, one of whom was also black, does not reasonably suggest that race was a motivating factor in Plaintiff's case.

In sum, the Court finds as a matter of law that none of Plaintiff's objections to

_____

[79] *See*, Pl. Dep. at 89-90 ("I didn't feel like I had a sufficient defense. And I wanted to, you know, like, what I needed to do to kind of protect myself. And I didn't really get any – any help from him."). Plaintiff further admits that he surreptitiously recorded the meeting with Thixton, Harp, and Soles, because he felt the investigation was focusing on him, and he wanted to protect himself. Pl. Dep. at 245 ("I felt like I needed to protect myself, so I recorded the message or the interaction.").

[80] Attalla Decl., ECF No. 49-4, Attachment 8, ECF No. 49-4.

Defendants' investigation would allow a reasonable juror to draw the inference that race was a motivating factor in the decision to fire Plaintiff.

### 2. Defendants' Alleged Racial Bias Prior to the Firing

Plaintiff maintains that in addition to CSL's alleged shoddy investigation, "[t]he [alleged] hostile work environment," discussed earlier, "is also strong circumstantial evidence that Plaintiff was fired because he is a Black man[.]"[81]   In particular, Plaintiff maintains that Thixton treated black employees with "open contempt" throughout the term of Plaintiff's employment, which, given Thixton's involvement in the decision to terminate him, suggests that race was a motivating factor in the decision. *See, e.g.*, ECF No. 53 at p. 1 ("Thixton was abusive throughout Plaintiff's employment.").

However, for the same reasons discussed earlier concerning the hostile environment claims, the Court finds no merit to this argument.  Again, Plaintiff has not raised a triable issue of fact as to whether any of the complained-of actions by Thixton was motivated by racial animus.

Neither has Plaintiff made any showing that any of the conduct purportedly constituting Thixton's "open contempt" had anything to do with the decision to terminate Plaintiff's employment.  For example, Thixton was not the person who initiated the investigation or who fired Plaintiff.  Rather, the investigation was initiated after Kitsmiller flagged the payments during a routine check of the Jasper report, after which the matter was referred to Thixton and Harp for investigation, and the decision to fire Plaintiff was made by Hedge, who is not alleged to have any racial bias.  Plaintiff has not shown that Thixton misrepresented or falsified any aspect of the investigation, or that he otherwise

---

[81] Pl. Memo of Law at 3.

improperly influenced Harp or Hedge into believing that Plaintiff should be fired.

### C. Retaliation

Lastly, Plaintiff contends that Defendants retaliated against him after he engaged in protected activity by complaining to Harp about Thixton, in violation of Title VII, Section 1981, and NYSHRL.

> To establish a retaliation claim under Title VII, a plaintiff must show that "(1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) (citation omitted). Courts apply the same principles to analyze retaliation claims asserted under § 1981. *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015).

> "The NYSHRL historically utilized the same standard as Title VII, but [since 2019, for retaliation claims under NYSHRL] a plaintiff must establish that: (1) he or she engaged in a protected activity as that term is defined under the [state or local law], (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct. [*Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 53 (2d Cir. 2025)] (citation omitted).
>
> ***
>
> Protected activity includes "opposing an unlawful employment practice". *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 275 (2d Cir. 2023). "[A]ny activity designed to resist or antagonize; to contend against; to confront; resist; or withstand discrimination" made unlawful by the relevant statute constitutes a "protected oppositional activity." *Littlejohn*, 795 F.3d at 317 (citing *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 276 (2009)). Protected activity thus includes not only "complaints involving discrimination against the complainant herself," but also "complaints of discrimination on behalf of other employees and complaints of discriminatory practices generally." *Id*.

> To qualify as protected activity, "the plaintiff need not prove that his underlying complaint of discrimination had merit, but only that it was

motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014) (citation omitted). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14–15 (2d Cir. 2013).

***

Implicit in [Title VII, Section 1981, and NYSHRL] is the requirement that the defendant was aware of the plaintiff's protected activity. *See Edelman*, 141 F.at 46 & n.10. "[G]eneral corporate knowledge that the plaintiff has engaged in a protected activity" is sufficient. *Id*. at 46 n.10. The knowledge requirement requires more, however, than establishing that the employer had general awareness of the plaintiff's conduct; the employer must also have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the relevant statute. *Kelly*, 716 F.3d at 15.

Finally, the causation standards differ slightly across the statutes. Under both Title VII and § 1981, a plaintiff must establish that retaliation was the "but-for" reason for the adverse employment action. *Edelman*, 141 F.4th at 51 (citation omitted). There can be more than one "but-for" cause of an adverse action, since the but-for test is a "sweeping standard" and "[o]ften, events have multiple but-for causes." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). To "show causation under the [NYSHRL], however, "a plaintiff need only show that retaliatory animus was a motivating factor, that is, that it played any role at all in the challenged conduct." *Edelman*, 141 F.4th at 49 (citation omitted).

*Espinoza v. CGJC Holdings, LLC*, No. 23CV9133 (DLC), 2025 WL 2430672, at *3–4 (S.D.N.Y. Aug. 22, 2025).

Further as to what constitutes protected activity, it is clear that complaints that merely reference unprofessional conduct and/or unfair treatment without reference to a protected characteristic are not protected activity. *See, e.g., Benn v. City of New York*, 482 F. App'x 637, 638–39 (2d Cir. 2012) ("[Benn's complaints] concerned disputes about the teaching curriculum and his responsibilities, the condescending manner in which one

65

supervisor spoke to him, and a late-night phone call from a supervisor that disturbed his sleep. Such complaints could not reasonably have been understood to protest statutorily prohibited discrimination and, thus, do not qualify as protected activity that may give rise to a claim of retaliation."); *see also, Trivedi v. St. Peter's Health Partners Med. Assocs., P.C.*, No. 23-7608-CV, 2024 WL 5087524, at \*5 (2d Cir. Dec. 12, 2024) ("[I]n a March 17, 2019, email to SPHPMA Director of Human Resources Anna Bauer, Trivedi wrote that McDonald had engaged in "workplace harassment and bullying" and had "broken every code of conduct ... with impunity."  That email also did not make claims of discrimination. Such generalized complaints do not suffice to establish that an employer reasonably could have understood that the employee was complaining of conduct prohibited by Title VII, the NYSHRL, or section 1981.  Trivedi's complaints in no way intimated that he believed McDonald's conduct to be influenced by his race or color and hence . . . Trivedi's complaints about McDonald did not constitute protected activity.") (citation, footnote, and internal quotation marks omitted); *Williams v. Westchester Med. Ctr. Health Network*, No. 21-CV-3746 (KMK), 2024 WL 990153, at \*11 (S.D.N.Y. Mar. 7, 2024) ("While the Court acknowledges that there are no magic words that must be used when complaining, it is nonetheless true that the onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." (citation and internal quotation marks omitted).

In the instant case, Defendants maintain that they are entitled to summary judgment on Plaintiff's retaliation claim primarily since Plaintiff did not engage in protected

66

activity.[82]  In particular, Defendants contend that during Plaintiff's conversation with Harp, involving Arthur Kerr's complaint that Thixton had spoken rudely to Plaintiff, Plaintiff never told Harp that he was being discriminated against on the basis of his race or color.

In opposition to Defendant's motion, Plaintiff submits an affidavit in which he merely states on this point, "*I complained about Thixton's racism* to Harp, his superior." ECF No. 55-9 at ¶ 30 (emphasis added).[83]  However, as discussed earlier, the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony," *Rule v. Brine, Inc.*, 85 F.3d at 1011, and, as set forth above, Plaintiff clearly testified at deposition that he never used the word "racism" during his conversation with Harp. *See*, Pl. Dep. at 150 ("I never used the word racism, either.  I just kind of spoke to the behaviors and the experiences that I had experienced.").  Consequently, Plaintiff's bald, conclusory, and contradictory assertion on this point does not create a triable issue of fact as to whether he engaged in protected activity.

Turning, then, to Plaintiff's deposition testimony, he at several points *characterizes* both Kerr's complaint to Harp and his own conversation with Harp as having involved

_____

[82] See, ECF No. 49-11 at p. 7 ("Plaintiff's retaliation claim is also insufficient as a matter of law because he never complained about race discrimination during his employment or otherwise engaged in legally protected activity.  . . .  And, [there is no] evidence showing that he was treated differently because of [a] conversation he had with Ms. Harp.").

[83] Plaintiff also argues that, "Defendants have not moved to dismiss [sic] Plaintiff's claim that he was subjected to a retaliatory hostile work environment.  As such, Defendants have waived any such argument and Plaintiff must be allowed his day in court on the retaliatory hostile work environment claim." Pl. Memo of Law, ECF No. 53 at 2.  However, even if Plaintiff had pled a separate retaliatory hostile work environment claim, which he did not, *see*, First Amended Complaint, there is no merit to this argument, since a retaliatory hostile work environment claim is a retaliation claim, and Defendants moved for summary judgment on the retaliation claim.  *See, e.g., Carr v. NYC Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023) ("A claim of 'retaliatory hostile work environment' must therefore be treated identically to a claim that an employer took multiple retaliatory actions that were, in the aggregate, materially adverse.") (internal quotation marks omitted).

67

"racism."[84]   However, Plaintiff's testimony about how Harp actually described Kerr's complaint, and about what Kerr actually told him about his complaint to Harp, does not contradict Harp's sworn testimony that Kerr's complaint to her did *not* involve an accusation of racism:

> Q. And what specifically did [Harp] convey to you about what Mr. Kerr had complained about?
>
> A. His initial complaint was about him hearing a conversation that John and I had about how -- *his complaint was about how John was talking to me*.  And I believe he also complained about his own interactions with John. *I never saw the complaint or anything like that, so I don't know the exactness of it*.
>
> Q. Okay. But in that conversation you had with Rhonda, what specifically did she say was the purpose of the meeting or what did she want to talk to you about?
>
> A. About -- about the complaint that Arthur had and that -- that it indicated that other people had experienced racism from John.
>
> Q. *Did she specifically state that Arthur raised concerns of racism or did she state that it was concerns about him being rude and unruly?*
>
> A. *I don't know exactly remember [sic] how she framed it*, but we ended up talking about racism.

Pl. Dep. at 149 (emphasis added).

Rather, Plaintiff's full testimony is consistent with Harp's contention that Kerr's complaint was "that John Thixton was rude and condescending." Harp Dep. at 139.  In particular, Plaintiff testified that Kerr's complaint to Harp involved Kerr being "upset about

––––––––––––––––––––––––––––––––––––––––
[84] *See*, Pl. Dep. at 149 (Asserting that Kerr's complaint to Harp "indicated that other people had experienced racism from John."); *see also, id*. ("[W]e ended up talking about racism.").

just John's *tone* . . .   [H]e had a lot of issues with John's *delivery*." Pl. Dep. at 326 (emphasis added); *see also, id*. at 324-325 ("[Arthur] felt like John was—spoke to him, you know, in a way that was *condescending*.  You know, from a place of superiority.") (emphasis added); *id*. at 326 *("[Arthur] was upset about just John's tone with me, his word choice*[.]") (emphasis added).

Similarly, Plaintiff's testimony about what he actually told Harp during their conversation does not indicate he ever complained that he or anyone else was experiencing discrimination on the basis of race.  Indeed, after Plaintiff suggested at deposition that the conversation had involved "racism," opposing counsel carefully pinned him down about what was actually said, and Plaintiff admitted that he never used the words "racism" or "racist,"[85] but rather, that he had complained about Thixton's "open contempt,"[86] which, as discussed earlier, Plaintiff defined as involving Thixton's "condescending" and "dismissive" "tone."[87]  Apart from that, Plaintiff testified only that he mentioned Thixton telling him to mop a floor; Thixton opening his office door; and Thixton giving jackets to three employees.  Plaintiff did not testify to specifically referencing race at any point during the conversation.

Even viewed in the light most-favorable to Plaintiff, this was insufficient to put Harp on notice that Plaintiff was complaining about racial discrimination. *See, Murphy v. City of Newburgh*, 785 F. App'x 900, 902–03 (2d Cir. 2019) ("Even viewed in the light most

_____

[85] *See, e.g.*, Pl. Dep. at 150 ("I never used the word racism either. I just kind of spoke to the behaviors and the experiences that I had experienced.").

[86] *See*, Pl. Dep. at 133 ("And I told her, you know, about, you know, John's open contempt[.]").

[87] Plaintiff stated that it was Thixton's "tone" that was offensive. *See*, Pl. Dep. 130 ("It would be his tone."); *see also, id*. at 61 ("The condescending tone.").

69

favorable to Murphy, nothing by way of deposition or affidavit testimony provides any details concerning the content of her communication with Ciaravino that could have allowed Ciaravino to reasonably have understood that Murphy's opposition was directed at conduct prohibited by Title VII.") (internal quotation marks omitted).

Plaintiff's bald and conclusory assertions that, despite the actual testimony, his conversation with Harp nevertheless involved "racism" or had "racist implications,"[88] are insufficient to raise a triable issue of fact. *See, e.g., Davis v. New York*, 316 F.3d at 100 ("[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion[.]") (citations and internal quotation marks omitted).

In sum, the record contains no evidence from which any reasonable inference can be drawn that Plaintiff referenced racial discrimination in his conversation with Harp. Consequently, the Court finds that Plaintiff has failed to raise a triable issue of fact as to whether he engaged in protected activity under Title VII, Section 1981, or NYSHRL. Defendants are therefore entitled to summary judgment on the retaliation claims.

CONCLUSION

Defendants' motion for summary judgment (ECF No. 49) is granted, and this action is dismissed. The Clerk is directed to enter judgment for Defendants and close the action.

SO ORDERED.

June 4, 2026
Rochester, New York

CHARLES J. SIRAGUSA
UNITED STATES DISTRICT JUDGE

---

[88] *See*, Pl. Dep. at 277 ("I told how I felt like John's actions were, you know, not just inappropriate but, also, they had, you know, kind of racist implications.").

70